BUGGS, Respondent, vs. ROCK COUNTY SUGAR COMPANY, Appellant.

*October 5—October 25, 1910.*

*Master and servant: Injury to servant: Explosion of gas: Negligence of master: Evidence: Sufficiency: Release: Competency to contract.*

1. In an action for personal injuries to an employee in defendant's sugar factory, upon evidence tending to show that chemicals which had recently been used in cleaning the sugar evaporators would, when in contact with the iron of which such evaporators were largely made, generate therein a dangerously explosive gas; that this fact was or should have been known to defendant; that it was customary after such chemical treatment to withdraw the gases from the evaporators by means of an air pump, but that this had not been done at the time in question; that while plaintiff was engaged in repairing one of the evaporators an explosion took place by which it was blown to pieces and plaintiff injured; and that there was no negligence on the part of plaintiff or of any fellow-servant,—the jury were justified in finding that defendant was negligent in permitting the explosive gas to be and remain in the evaporator.

2. From the fact that an explosion took place under such circumstances the jury were authorized to infer that it was an explosion of gas and that it was preceded by ignition or any of the ordinary causes of explosion.

3. It was not essential to the liability of defendant that the cause of ignition should be shown so long as it appeared that it was not caused by any negligence of the plaintiff.

4. Evidence that the sum paid to plaintiff in consideration of a release of his claim was very small; that the settlement was improvident; that the release was signed ten days after plaintiff had received severe cranial injuries and while he was at the hospital without counsel; that he was incompetent to contract a few days prior to such signing and was also incompetent ten days thereafter and so continued for several weeks; and that he had lost all recollection of what took place at the hospital,—was sufficient to sustain a finding by the jury that at the time of signing the release plaintiff was incompetent to contract.

APPEAL from a judgment of the circuit court for Rock county: GEORGE GRIMM, Circuit Judge. *Affirmed.*

For the appellant there was a brief by *Jeffris, Mouat, Smith & Avery,* and oral argument by *M. G. Jeffris* and *L. A. Avery.* Among other authorities, they cited *Hyer v. Janesville,* 101 Wis. 371, 77 N. W. 729; *Chybowski v. Bucyrus Co.* 127 Wis. 332, 106 N. W. 833; *Jackowski v. Ill. S. Co.* 103 Wis. 448, 79 N. W. 757; *German Bank v. Muth,* 96 Wis. 342, 71 N. W. 361; *Schiefelbein v. Fidelity & C. Co.* 139 Wis. 612, 120 N. W. 398; *Steffen v. Supreme Assembly,* 130 Wis. 485, 110 N. W. 401; *Kowalke v. Milwaukee E. R. & L. Co.* 103 Wis. 472, 79 N. W. 762; *Chafin Will Case,* 32 Wis. 557; *Will of Silverthorn,* 68 Wis. 372, 32 N. W. 287; *McMaster v. Scriven,* 85 Wis. 162, 55 N. W. 149; *Cutler v. Cutler,* 103 Wis. 258, 79 N. W. 240; *Gavitt v. Moulton,* 119 Wis. 35, 96 N. W. 395; *Trieloff v. Muellenschlader,* 128 Wis. 364, 107 N. W. 652; *Henderson v. McGregor,* 30 Wis. 78.

*J. J. Cunningham,* attorney, and *William Ruger,* of counsel, for the respondent (brief by *Mr. Ruger*), cited, besides other cases: *Kirst v. M., L. S. & W. R. Co.* 46 Wis. 489, 1 N. W. 89; *Cummings v. Nat. F. Co.* 60 Wis. 603, 18 N. W. 742, 20 N. W. 665; *Spille v. Wis. B. & I. Co.* 105 Wis. 340, 81 N. W. 397; *Lipsky v. C. Reiss C. Co.* 136 Wis. 307, 117 N. W. 803; *Oberndorfer v. Pabst,* 100 Wis. 505, 76 N. W.

338; *Smith v. Smith,* 60 Wis. 329, 19 N. W. 47; *Henrizi v. Kehr,* 90 Wis. 344, 63 N. W. 285; *Blohowak v. Grochoski,* 119 Wis. 189, 96 N. W. 551; *O'Brien v. C. & N. W. R. Co.* 92 Wis. 340, 66 N. W. 363; *Maxon v. Gates,* 136 Wis. 270, 116 N. W. 758; *Ferguson v. Truax,* 136 Wis. 637, 118 N. W. 251; *Schultz v. C. & N. W. R. Co.* 44 Wis. 638; *Watkins v. Brant,* 46 Wis. 419, 1 N. W. 82; *Voell v. Kelly,* 64 Wis. 504, 25 N. W. 536; *Bussian v. M., L. S. & W. R. Co.* 56 Wis. 325, 14 N. W. 452; *Sheanon v. Pacific Mut. L. Ins. Co.* 83 Wis. 507, 53 N. W. 878; *Lord v. Am. Mut. Acc. Asso.* 89 Wis. 19, 61 N. W. 293; *Mensforth v. Chicago B. Co.* 142 Wis. 546, 126 N. W. 41; *Ludington v. Patton,* 111 Wis. 208, 86 N. W. 571.

TIMLIN, J.    In this action for personal injury the defendant was charged in the complaint with negligence causing such injury, consisting of carelessly managing and operating an evaporator in a sugar factory so that a large amount of explosive gas was generated and confined therein until the same exploded; also negligently setting the plaintiff to work on the generator without warning or instructing him of the presence of such gas, the liability of the generation of such gas, or the dangers incident to his work.    The jury found the defendant guilty of negligence in caring for and managing the evaporator which exploded, the plaintiff free from contributory negligence, and that the negligence of the defendant was the proximate cause of plaintiff's injuries.    On this appeal the defendant contends that a nonsuit should have been granted, that there is not sufficient evidence to support the verdict, and that there was an accord and satisfaction shown.    A motion for a new trial on the part of defendant was made and overruled and this ruling is also assigned as error.

On September 20, 1907, the defendant corporation, preparing its factory to begin for the ensuing season the manufacture of beet sugar, had in the main building of its factory

on the second floor in front of the entrance a battery of four large evaporators. These large evaporators were about fifteen feet long, seven feet wide, and twelve feet high to the top of the dome. They were made of a shell of cast iron about seven-eighths of an inch thick, had wood casing on the outside and a hollow interior in which were numerous brass tubes of about one inch diameter passing lengthwise through the evaporator and connecting with a steam chest at the end. In operation these steam chests and brass tubes contained live steam. The remaining portion of the interior space in the evaporator is called the juice chamber, and in operation is partially filled with prepared beet juice which is vaporized by heat from the steam in the brass tubes and steam chest. To facilitate this operation and cause the beet juice to boil at a lower temperature, an air pump operated by steam from the boiler room some distance away is connected with that part of the juice chamber above the beet juice. By action of this air pump the superincumbent air is exhausted and the juice is consequently boiled or vaporized in a vacuum. In order to have this vacuum the juice chamber must, of course, be air tight at every point. In this operation sediment forms in these evaporators and on the outside of the steam tubes. This sediment, according to the witness Professor Kahlenberg, consists of various salts of calcium, oxalated calcium, silicate of calcium, and other more complicated salts which form a hard crust on the tubes in the evaporator. This crust, by reason of its minor conductivity for heat, retards or prevents the operation of the evaporator. It is necessary to remove this crust. The usual method is to put a quantity of soda into the juice chamber, pour in water, and boil this mixture, which has the effect, by combination with the crust on the tubes or in the evaporator, to change it to calcium carbonate. A weak solution of muriatic acid and water is thereafter poured into the juice chamber and thereby a soluble salt known as chloride of calcium is formed, which is thereafter washed away

with water.   Carbonic acid gas is liberated in this process and hydrogen gas is generated from the contact of the solution of muriatic acid in water with the iron and perhaps other metals in the interior of the evaporator.   This hydrogen gas is explosive by ignition when mixed with air.   It is also exploded by a high degree of heat.   .Whether it may be exploded by detonation is not shown, and so far as we know is not sufficiently established as a scientific fact for this court to take judicial notice thereof.   Hydrogen gas is perhaps the lightest known gas, lighter than air, consequently will ascend, but has the property of diffusion common to all gases, and when first generated would remain at or toward the top of this juice chamber, but would diffuse downward and mix with the air.

Beginning two or three days prior to September 20, 1907, the defendant was engaged in cleaning the evaporators in question by this chemical process or some modification thereof. The evidence seems to show that the soda, muriatic acid, and water were all put in together, and to fail to show whether or not this mixture was boiled.   The plaintiff began carrying soda and muriatic acid, put some into other evaporators, but did not put any into that by the explosion of which he was injured.   There was competent and sufficient evidence, however, for the jury to infer that all the evaporators were cleaned and that all were treated alike, and that all were washed out with water after the process mentioned.   But there was no steam on at the time of the explosion.   After the acid was in, covers were put on the manholes and the interior made tight, apparently.   A glass gauge on the side of each evaporator, connected with the juice chamber at the top and at the bottom and about three feet long, was in use.   It does not clearly appear whether this connected at all times with the interior of the evaporator or whether there was a shut-off. After repairing the glass indicator on evaporator No. 2 it was found necessary to repair the same device on evaporator

No. 3. The plaintiff was in the machine shop and received instructions to fit up what he calls a "nipple" for this indicator on evaporator No. 3 by cutting one out of a pipe about eight or ten inches in length and putting a screw thread on it. Having this nipple prepared, plaintiff and one Berger went to put it on the evaporator, taking with them a pipe wrench. It was to be inserted into evaporator No. 3 about ten inches from the bottom. The old nipple that had been in there was out, and there were some screw threads left in the place the old nipple was taken from—that is, the opening in the side of the evaporator into which this nipple was screwed. Plaintiff started to insert with the wrench the new nipple into this opening and it went in very hard. He used both hands on the wrench, and while he was doing this an explosion took place by which evaporator No. 3 was blown to pieces, Berger was killed, and the plaintiff severely injured.

From the foregoing it will be seen that this chemical process of cleaning the interior of the evaporator is an ordinary and well known process, no doubt subject to modifications in detail in particular plants. That dangerous explosive gases are thereby generated is or ought to be well known to those employing such methods. Professor Kahlenberg testifies: "It is absolutely certain that hydrogen will be formed when this solution of acid is in contact with iron. There is never any circumstances or any time when it will not form when so in contact." Doubtless conditions may exist in the interior of the generator or modifications of the chemical method of cleaning may be employed which will greatly facilitate the formation of this gas and increase the volume of gas formed and the rapidity with which it is formed. When conditions exist which cause the transformation of solid or liquid matter into aeriform matter within a confined space, there may be a bursting of the container without a true explosion. This is sometimes popularly called an explosion, as in the case of a steam boiler, a wine cask, or a wine bottle bursting. A jury

would be unable to say that this occurred in the instant case, because it appears that there was an opening for the insertion of the nipple into the interior of the juice chamber in which the gas was generated or was in process of generation.    This, if true, would negative mere bursting.    Real explosions are caused by heat, ignition, or detonation.    These words sufficiently describe causes and processes.    No sufficient evidence of heat to the required degree to cause explosion is shown. No evidence of actual ignition or of detonation is produced. Ignition of certain substances results from friction.    The friction is shown to have occurred, but the presence of those substances which may be ignited by friction is not shown. But the fact of explosion is evidence from which the occurrence of either cause not negatived by evidence may be inferred by the jury.    The explosion is *prima facie* evidence that there was ignition or detonation, because these are the remaining causes of explosions.    We have to deal here with a matter of circumstantial evidence.    That the explosion was caused by the negligence of a fellow-servant is negatived. The explosion was of course instantaneous.    What was done by all the servants engaged in the work is detailed and described, and nothing contrary to the usual procedure was done by either to cause or produce the explosion.    The negligence of the master did not consist in causing the explosion.    The negligence of the master consisted in producing and permitting to remain in the generator this dangerous gas, at any moment liable to explosion from either of the causes mentioned.    The friction of screwing in the nipple might cause ignition, especially if there was grit of some kind in the socket.

We conclude that there was evidence from which the jury might find that the defendant was negligent in allowing this explosive gas to be and remain in the generator while the plaintiff was working upon and repairing the generator. The defendant seems to have taken no pains to ascertain

whether or not this gas had formed and remained in the generator. It has offered no evidence to rebut the natural inference from the explosion. It is said that the interior of the generator, described as the juice chamber, was washed out with water after the muriatic acid had been poured in. The evidence is very meager on this point. If the whole cavity was filled with water, that would necessarily exclude or drive out the gas; if not, but the water was merely run through at the bottom of the juice chamber, it would have no such effect. If the water is not run through in sufficient quantity to wash away all the acid and to check the formation of gas which had already begun, it would have no such effect. The evidence does not establish the extent or the effect of this washing, and the evidence does establish, from the fact of explosion, that the gas was there after the water was run through. There is no evidence that on these particular generators there existed any devices, other than the air pump, to relieve the generator of the gases likely to be formed in this process of cleaning, nor that the plaintiff or his fellow workmen knew aught about the generation of gases produced by this process. There is also evidence tending to show that it is customary, after this chemical treatment, to start up the air pump, and by the operation of this pump withdraw all gases from the interior of the evaporator; and this was not done at the time in question. It is not shown nor can it be inferred that it was the duty of the plaintiff or his fellow-servant to start this pump. We conclude that the question of defendant's negligence upon these facts was for the jury.

After the explosion the plaintiff was found lying between the evaporators under a large piece of iron and he was unconscious. When Dr. Gibson arrived at the factory, shortly after the time of the accident, he found Dr. Edden there and found the plaintiff lying on a table or bench unconscious, Dr. Edden working at him trying to stop hemorrhage. They dressed his wound, took out a piece of the malar bone

near the left eye, opened up the wound, bandaged his head,. and took him to the hospital. Dr. Gibson with Dr. Edden attended him then for a period of about ten days. He testifies that he never tried to see how much mental ability the plaintiff had during this time,—it wasn't a proper thing for one to do to a man in that condition. The plaintiff himself testifies that he has no recollection of being at the hospital at. all, nor of anything that took place there. The brother and sister of the plaintiff who visited him at the hospital described his condition while at the hospital and after his return to his sister's house. His sister who visited him at the hospital was permitted to see him for the first time five or six days after the explosion, and she went to the hospital every day afterward while the plaintiff was there except two days. When she first saw him he could not see her. He had little strength, and for two weeks after he got home he moaned and showed signs of agony. Immediately upon his return home they had to repeat things over to him, and he would say he didn't know what was said or understand what they were saying. Dr. Pember, who first treated the plaintiff on the 10th of October, found a fracture of the upper part of the malar bone with the removal of part of it, and an inflammation that extended to all parts of the left eye and destroyed the eye. On October 10th, according to this witness, the plaintiff was dazed, stupid, and did not comprehend well. His mind worked slowly, his physical condition was bad, his face was. emaciated, and his eye red, inflamed, and very painful. The doctor also testified that for two or three, weeks after he first had charge of the plaintiff the latter did not have perception,. memory, and judgment enough to transact important business. The plaintiff was confined to his bed at the hospital until September 28th. On September 29th or 30th his. brother brought him some clothes, and from that time he walked around in the hall and out of doors for a few days. On the 1st of October he said to Dr. Edden, who was present.

attending him as physician employed by the defendant, that he wanted to leave the hospital, did not like it there and wanted to go home, and wanted to get his brother because he had no money to pay the hospital fees. The doctor suggested that the defendant would pay his hospital fees. After some consultation he asked the doctor whether he could see Mr. Osburn, the defendant's superintendent, because he wanted to leave the hospital, did not want to stay there any longer, wanted to go home. Doctor Edden was evidently in communication with Mr. Osburn, because on October 1st Mr. Osburn and Dr. Edden together visited the plaintiff at the hospital. Mr. Osburn had a release prepared before he left his office, the plaintiff signed it at the hospital in their presence on October 1st, and by this release, in consideration of $24.50 and in consideration of the payment by the defendant of the hospital bill and the doctors' bills, he acknowledged receipt in full and discharged the defendant from all claims and demands of every kind and nature up to date and which might thereafter result from any injuries theretofore received. On September 24th the plaintiff was visited at the hospital by Dr. Edden and an attorney for the defendant and a stenographer and questioned, and his questions and answers reduced to writing. Doctor Edden and Mr. Osburn also testify to the effect that the plaintiff was in possession of his faculties when he signed the release, and there is much evidence to that effect which we need not consider in a case like this where the inquiry is whether there was sufficient evidence to the contrary to support the verdict.

Upon this showing it was a question for the jury whether or not the plaintiff, at the time he executed the release, was in possession of sufficient intelligence and mental capacity to comprehend the nature and import of his act. The evidence is direct and positive that for some time after the injury plaintiff had no such capacity. It is also direct and positive to the effect that on October 10th and continually for several

weeks thereafter, plaintiff had no such capacity. The sum paid was insignificant as compared with his injuries, and the settlement was improvident, and the defendant testifies that he has no recollection concerning it. All these are evidentiary facts which the jury was at liberty to consider. The answers of the witness to the defendant's attorney on September 24th as taken down by the stenographer also contain some evidence bearing upon his mental capacity. It is not to our minds so conclusive as it appears to appellant's counsel. At the time of the release plaintiff was at the disadvantage, resulting from his weakness and injuries and without counsel. In order to find him competent we must disregard the foregoing facts and discredit the opinions of Drs. Pember and Gibson, or assume that the plaintiff had a recovery between September 23d and October 10th in the nature of a lucid interval in which he was competent to contract. We cannot disturb the verdict of the jury under such circumstances. It follows that the judgment of the circuit court should be affirmed.

*By the Court.*—Judgment affirmed.

Winslow, C. J., and Marshall, J., dissent.