SCHWEIKERT, Appellant, vs. JOHN R. DAVIS LUMBER COMPANY, Respondent.

*October 24—November 14, 1911.*

*Settlement: Release of claim for personal injuries: Validity: Evidence: Fraud: Mental competency: Changing verdict.*

1. Settlements fairly made and untainted by fraud should be upheld.
2. To impeach a formal written instrument on the ground of fraud or mistake the proof must be clear and convincing beyond reasonable controversy.
3. In an action for personal injuries, evidence (stated in the opinion) is *held* insufficient to avoid a written contract of settlement and release, and to have warranted the trial court in changing a finding by the jury that plaintiff at the time of signing was not mentally competent to make such contract.

APPEAL from a judgment of the circuit court for Price county: E. B. BELDEN, Judge. *Affirmed.*

This action is brought to recover damages for personal injury. The defenses interposed were (1) a release and settlement; (2) contributory negligence on the part of the plaintiff; and (3) no negligence on the part of the defendant. A special verdict consisting of twenty-one questions was returned by the jury. The first, second, seventh, ninth, eleventh, twelfth, thirteenth, and sixteenth questions and the answers returned thereto are as follows:

"(1) Did the plaintiff execute the contract of settlement and release in question? A. Yes.

"(2) If you answer the first question 'Yes,' did the plaintiff at the time of signing the same possess sufficient understanding to know the nature of the release and its effect? A. No."

"(7) Did the defendant negligently fail to inspect the tongs before the plaintiff's injury, to ascertain the sufficiency and strength thereof for the work in question? A. Yes."

"(9) Did the defendant negligently fail, before the injury to the plaintiff, to warn the plaintiff of dangers incident to remaining inside the rails after the tongs had been fixed to the rail and while the track was being lifted? A. Yes."

"(11) Was the danger of remaining between the rails after the tongs had been fixed to the rail and while the track was being lifted obvious to a person of plaintiff's experience, intelligence, and understanding? A. No.

"(12) Did the plaintiff, before his injury, know and appreciate the dangers incident to remaining between the rails after the tongs had been fixed to the rail and while the track was being lifted? A. No.

"(13) If you answer question 12 'No,' then ought the plaintiff in the exercise of ordinary care, considering his experience, intelligence, and understanding, to have known and appreciated the dangers incident to remaining between the rails after the tongs had been fixed to the rail and while the track was being lifted? A. No."

"(16) Were the tongs reasonably safe for the work being done at the time of plaintiff's injury? A. No."

The court changed the answers to all of these questions, excepting the first and twelfth, as not supported by the evidence, and awarded judgment for the defendant, from which judgment this appeal is taken. The other questions sub· mitted to the jury are not material to a decision of the matters involved on this appeal.

*W. K. Parkinson,* for the appellant.

For the respondent there was a brief by *Barry & Barry,* attorneys, and *A. W. Sanborn,* counsel, and oral argument by *Mr. M. Barry* and *Mr. Sanborn.*

BARNES, J.    The court set aside the answers of the jury to the second, seventh, ninth, eleventh, thirteenth, and sixteenth questions in the verdict, and in substance held as a matter of law (1) that the plaintiff was competent to make the settlement and to sign the release which he executed; (2) that defendant was not negligent; and (3) that the plaintiff was guilty of contributory negligence. If the trial court was right as to any of these questions the judgment must be affirmed.

Plaintiff's left leg was badly fractured and bruised and his head was cut and his skull fractured over the right eye. He suffered much pain after the accident. It is conceded that from August 17th to August 25th there was an abscess forming in the injured leg and that during this time the plaintiff was delirious and restless at times, particularly at night. The leg was lanced and the pus removed on August 25th. The injury occurred on July 31st. The alleged settlement was made September 19th, fifty days thereafter, and twenty-five days after the lancing took place. Plaintiff left the hospital on October 10th, twenty-one days after he signed the release.

Plaintiff sought to avoid the effect of the release by testifying that he was delirious or insane or unconscious at the time he signed it, and he denied that the signature thereto

was his.   He said he had no recollection of seeing or discuss-
ing the terms of settlement with defendant's agent and had
no recollection of having signed any paper.   He accounts
for this condition of mind by saying that there was another
abscess forming in the injured leg at the time the alleged set-
tlement was made, from which he was suffering great pain,
and which was thereafter lanced, and that he was being doped
with whisky or morphine at the time, so that he was in a
comatose state.   The physician who attended plaintiff was
not called as a witness.   Dr. Parker, testifying as an expert,
said that the formative period of an abscess was painful;
that during the formation there is always more or less septic-
æmia which might produce fever, and that fever makes the
subject flighty and more or less delirious.   There is no claim
that the wound on the head particularly affected the brain.

The following is a brief *résumé* of the testimony on which
the court concluded that the plaintiff was competent to make
the contract of settlement, notwithstanding his testimony and
the finding of the jury that he was incompetent:

Perhaps the most important item of evidence bearing upon
plaintiff's condition was the clinical report kept by Sister
Galla at St. Joseph's Hospital at Chippewa Falls, where the
plaintiff was being treated.   This record was begun on Au-
gust 1st, when plaintiff was admitted, and was discontinued
after September 11th for the reason as stated that the condi-
tion of plaintiff was such that there was no further need of
continuing the record.   This record showed the temperature
and pulse of the plaintiff from day to day, which were gen-
erally taken twice a day; the medicine, nourishment, and
stimulants given to him, and remarks showing when his
wounds were dressed; whether the patient was quiet or rest-
less, how he slept and when he complained of pain, as well as
some other information of a like character.   The record was
kept in part at least for the information of the doctor, so that
he might know the condition of the patient at different hours

of the day, and it was discontinued by his permission on September 12th, because there was no further necessity for keeping it. This record did not show a high temperature or a very rapid pulse until about August 19th. On that day the temperature was 104.6 and the pulse 100, and on the following day the patient's temperature was 104 and his pulse 110. The temperature was reduced to 98 and the pulse to 80 on August 26th. From September 2d to September 10th inclusive the temperature varied from 98 to 99.4 degrees, and the pulse from 72 to 80 beats per minute. The record showed that the patient was given morphine on August 5th, August 20th, and August 25th, and that he was given whisky by the doctor's orders from time to time up to September 5th. The record further showed that the patient was discharged from the hospital as cured on October 10th. This record makes no mention of any abscess being formed about September 19th, when the release was signed. If the plaintiff was in the condition in which he testified he was, the necessity for keeping a clinical record about September 19th was certainly as great as it was at any time during his confinement at the hospital, and it is very significant that that record was discontinued nine days before, with the doctor's permission, and that it was not resumed. The nurse stated that the record was discontinued because there was not much to do with the patient any more; that the patient was getting better, and there was nothing in particular to keep track of thereafter. The sister further testified that between the 25th of August and the 10th of October the patient was improving and his mind was all right. This witness further testified that she was not present when the settlement was made, but that the plaintiff told her on September 19th, when he went back to his cot, that "he was very glad this morning, that he had settled with the company." This question was then asked her: "Did you notice what his condition was that morning mentally, his mind?" And she answered: "He

was very happy and glad, he was all right." The witness further testified that she had noticed nothing wrong with his mental condition except a few days from the 17th to the 25th of August, when he was delirious at times, mostly at night. The sister superior of the hospital testified that Mr. Nutter, the agent of the defendant who settled with the plaintiff, was at the hospital on September 19th, and that *Mr. Schweikert* gave her the check for safekeeping which was given to him in settlement of his claim against the defendant. She testified she thought he was able to transact business on that day, and she never had any doubt of it, and that she did not notice anything in his actions or words that left any doubt in her mind as to his ability to transact business.

Mr. Nutter testified that he went to Chippewa Falls on August 20th for the purpose of settling with plaintiff; that he called on him twice while he was there, but did not talk settlement with him because the plaintiff was very sick. This latter statement is corroborated by the clinical report. His next visit was on September 19th, some nine days after a letter had been written to the defendant purporting to come from the plaintiff, in which plaintiff's condition was described. He testified that he asked the sister superior what plaintiff's condition was and she informed him that he was well and there was really no reason why he could not leave the hospital and go to Phillips as soon as he liked, as there was nothing more they could do for him. He testified further that he told the plaintiff he was there to settle with him, and that plaintiff said he would probably be laid up for several months before he got out so he could do a full day's work, and that he spoke of his expenses and of his renting a house at Phillips, and his expenses for wood and rent, and finally said he ought to have $250; that he didn't want to name a figure which would include his doctor and hospital bills, but that he wanted the company to pay those bills, and he thought he ought to have $250 besides, and that that would be satis-

factory to him; that plaintiff's mental condition was all right, and that he gave plaintiff a check for $250 and agreed to pay the expenses referred to, and plaintiff signed a release. Further, that plaintiff expressed satisfaction at making a settlement and said there had been a couple of lawyers there to see him. Witness further testified that he did not represent to the plaintiff that the defendant was not liable for the injury.

B. W. Davis testified that he was formerly the secretary of the defendant company and that he met the plaintiff after the settlement had been made with him; that plaintiff called at his office and thanked him for what the company had done in settling with him. Witness said: "After thanking me he asked for some firewood and I told him the settlement did not call for any wood. He said he was to have wood." The witness further stated that he called Mr. Nutter into the office and told him in the presence of *Schweikert* the claim that was made, and that Mr. Nutter said he did not promise anything except what the agreement stated. *Schweikert* then said he was to have wood if he left the hospital quicker than he might have done and that he might have remained in the hospital longer. Mr. Davis then told him he would give him some wood, but it was gratuitous. He asked plaintiff how much he wanted and he said five loads. Witness further testified: "I told him we would give them to him and when they were gone to come back and see me." This conversation occurred about the middle of November after plaintiff was discharged from the hospital. A letter was written to the defendant under date of August 11, 1907, wherein a request was made for the balance due to the plaintiff, and the statement was made that he was gaining slowly. Plaintiff denied that he either wrote or signed this letter. There was evidence from which the jury might well have found that he signed the letter, although it might also have found the contrary. Defendant received another letter purporting to come from the plaintiff, dated September 10, 1907, which was

written in reply to a letter mailed plaintiff by the defendant under date of September 9th. In this letter the condition of plaintiff is described, and the statement is made that he is getting along all right and it will not be very long until he returns to Phillips. The first sentence of the letter is: "I received your letter this morning and want to answer it right away." It is practically conceded that this letter was neither written nor signed by the plaintiff, but it is the contention of the defendant that it was dictated by him. The plaintiff, however, denies any knowledge of the letter or of its contents. He also denies any knowledge of signing the release or any knowledge of indorsing the check which he received in settlement for his claim, and expresses doubt as to whether the name indorsed on the back of the check was written by him or not. There are some other facts in the case bearing on the mental competency of the plaintiff to execute the release, but the principal ones have been alluded to.

This court has not been partial to contracts of settlement made with employees with unseemly and often indecent haste for trifling amounts when their physical and mental condition was such that they were unable to intelligently comprehend what they were doing. *Lusted v. C. & N. W. R. Co.* 71 Wis. 391, 36 N. W. 857; *Albrecht v. M. & S. R. Co.* 94 Wis. 397, 69 N. W. 63; *Mensforth v. Chicago B. Co.* 142 Wis. 546, 126 N. W. 41, 512; *Buggs v. Rock Co. S. Co.* 143 Wis. 462, 128 N. W. 100. Settlements fairly made and untainted by fraud are to be encouraged rather than lawsuits, however. If all a plaintiff need do in an action of this kind, in order to overturn a written agreement of a settlement in fact fairly made, is to swear that he was unconscious or insane at the time he made it, employers would have little inducement to make settlements in any case directly with the employee. The latter has the benefit of the money which he received whether there is any legal liability on the part of the employer or not. To allow the employee to secure what he can

by way of a compromise settlement, and then resort to the courts to secure larger damages if he has a case, would enable him to practice a fraud which should not receive judicial countenance. Every fact and every circumstance, excluding the evidence of the plaintiff, tends to show a valid settlement in the instant case. Twenty days after the accident the defendant sent its agent to interview the plaintiff in regard to a settlement. On that occasion the agent did not think the condition of the plaintiff was such that the matter of settlement should be discussed. Twenty days later the defendant received a letter purporting to be written by the plaintiff and in which he was made to say that he was improving right along; that he had been up in the three-wheel chair; that he expected to be on crutches in a week; and that it would not be very long until he would meet the defendant at its office if everything went all right. It was nine days after this letter was written before defendant's agent called on the plaintiff. There is no pretense that the agent made any assertion of nonliability on the part of the defendant or made any misrepresentations to him whatever. Plaintiff permitted the defendant to pay his hospital and doctor bills and used the $250 which was paid him, and makes no satisfactory explanation as to why he thought the money was paid him and his bills taken care of. The clinical record is a convincing item of evidence to show mental competency on the part of the plaintiff. He had such competency, unless Sister Galla, the sister superior, Mr. Nutter, and Mr. Davis were mistaken in the evidence which they gave or testified to what they knew to be untrue. The evidence of the plaintiff generally is impeached by many facts and circumstances shown in the case. His evidence that he did not know anything for the first seven weeks after he was injured is impeached by contradictory statements made by himself, as well as by other convincing evidence. It is true that the injury to the plaintiff was serious and that the amount paid him was small, but it is also

true that the questions of defendant's negligence and of plaintiff's contributory negligence were, to say the least, close, and the trial court set aside the findings of the jury favorable to the plaintiff on both propositions because not supported by any credible evidence.    So it would be difficult to say that the certainty of $250 and doctor and hospital bills would not be preferable in the instant case to the uncertainty of a lawsuit.

To impeach a formal written instrument on the ground of fraud or mistake the proof must be clear and convincing beyond reasonable controversy.    *Jackowski v. Ill. S. Co.* 103 Wis. 448, 79 N. W. 757; *Steffen v. Supreme Assembly,* 130 Wis. 485, 110 N. W. 401; *Schiefelbein v. Fidelity & C. Co.* 139 Wis. 612, 120 N. W. 398.    The trial court instructed the jury that such was the law applicable to this case.    Much deference must be given to the ultimate conclusion reached by the trial court.    *Lind v. Uniform S. & P. Co.* 140 Wis. 183, 188, 120 N. W. 839, and cases cited.

The evidence in this case is such that we do not think the conclusion of the trial court should be condemned, although contrary to that reached by the jury.    In no case decided in this court where the facts were substantially similar to those in the case at bar has the court held that the evidence was sufficient to avoid a written instrument showing settlement. This conclusion renders unnecessary the consideration of any other questions raised in the case.

*By the Court.*—Judgment affirmed.