SCHMIDTKE, Respondent, vs. GREAT ATLANTIC & PACIFIC TEA COMPANY OF AMERICA, Appellant.

*November 8—December 3, 1940.*

For the appellant there was a brief by *Gorman & Park* of Wausau, attorneys, and *Rieser & Mathys* of Madison of counsel, and oral argument by *Clifford G. Mathys*.

For the respondent there was a brief by *H. F. Guenzl*, attorney, and *Carlyle B. Wurster* of counsel, both of Merrill, and oral argument by *Mr. Wurster*.

FRITZ, J.  Defendant's principal assignment of error is that the court erred in its findings of fact and conclusions of law upon which it entered judgment setting aside the settlement and release of July 17, 1939. The facts which led up to the making of the settlement are not in dispute. When plaintiff sustained injuries on June 30, 1939, to his arms, shoulders, and left knee, as the result of defendant's negligence, its store manager sent him to Dr. Erling Ravn, who treated him and sent a written report of his condition to his attorney, H. F. Guenzl, and also to the store manager. On July 15, 1939, plaintiff asked Dr. Erling Ravn whether he could go to work, but also said that his right arm was "a little sore yet," and that he "couldn't very well work." Dr. Ravn replied, "That is going to be nothing when you exercise it a little bit for light work; you can do that;" and also told plaintiff he could make a settlement of his claim. Plaintiff reported the physician's statements to his attorney, Guenzl, who then telephoned to Mr. Horne, a claim adjuster acting on behalf of defendant, that plaintiff was ready to settle. On July 17, 1939, plaintiff resumed working as a mason in building a stone fireplace with the aid of a helper; and that morning Horne and Guenzl discussed making a settlement. Neither of them wanted to settle plaintiff's claim until advised by Dr. Ravn that plaintiff was all right and able to work, and that it was safe for him to settle although his arm still bothered him. At Horne's suggestion Guenzl, in a telephone conversation with Dr. Erling Ravn, told him that he and Horne wanted to make sure that it was safe for plaintiff to settle and asked whether it would be all right to do so. Dr. Ravn replied that plaintiff had made an uneventful re-

covery and was able to go back to work, and was ready for a settlement even though there was still slight soreness in his arm; that this soreness would work itself out if he went back to his regular work; and that Dr. Ravn could do nothing further for him and nature would just have to take its course. Guenzl repeated the conversation to Horne, and relying thereon they then agreed on a settlement at $220, of which $20 was for Dr. Ravn's bill. Horne prepared a release of the defendant "from any and all claims, demands . . . arising from or by reason of any and all known or unknown, foreseen or unforeseen bodily or personal injuries, . . . and the consequences thereof, resulting, or to result, from" the accident to plaintiff on June 30, 1939. Horne and Guenzl then called on plaintiff at his place of work and he signed the release upon Guenzl's explanation of the settlement. Plaintiff worked from July 17 to August 17, 1939, at a lower hourly wage rate, but instead of working sixty-four hours a month as theretofore, he worked one hundred thirty hours regularly and put in twenty-six additional hours. His right arm did not bother him at first, but as he continued to work it got worse and the last week he could hardly lift the trowel. When he came home from work on August 17th his upper arm was swollen and had a blue spot on it. It had not swelled up before August 17th, and he was not injured in any other way since June 30, 1939. On August 17th or 19th he went to Drs. Ravns' clinic and was treated by Dr. Bjarne Ravn in the absence of Dr. Erling Ravn. During the first few .weeks after August 17th, plaintiff had a great deal of pain and at the time of the trial he testified that he could then do light work but not heavy work.

The court's findings of fact and conclusions of law are to the following effect:

"The settlement of July 17th, 1939, and the concurrent release and payment of money pursuant thereto, were entered into and concluded in good faith by both plaintiff and defendant who both relied upon statements by Dr. Erling Ravn that plaintiff was able to resume light work; that the slight pain in his arm was unimportant and would disappear in a short time after plaintiff resumed work, and that plaintiff had no disability and was in a condition ready to settle his claim against defendant."

"That such statements were erroneous, but made in good faith by Dr. Erling Ravn to both plaintiff and defendant."

That such statements "were representations as to existing facts upon which both the plaintiff and defendant had a right to rely."

That on July 17, 1939, plaintiff was in fact suffering from an injury to the blood vessels deep in the muscles of his right arm, which condition was unknown to the parties and Dr. Erling Ravn until after August 17, 1939, when the undisclosed injury manifested itself, and disabled plaintiff for several months thereafter, and resulted in substantial permanent disability to plaintiff's arm.

That Dr. Erling Ravn in treating plaintiff from June 30 to July 17, 1939, was employed by the defendant to treat the plaintiff, and in so doing was the defendant's agent.

And that plaintiff is entitled to judgment setting aside the settlement and release and for $1,500 additional damages.

Defendant contends in support of its principal assignment of error that in order to set aside a release mistake as to a present or past fact must be shown beyond a reasonable doubt, but a preponderance of the evidence is not sufficient; and that in the case at bar there was no mistake as to the fact that Schmidtke was ready for light work on July 15th, and no clear proof of a mistake in the diagnosis made by Dr. Erling Ravn on July 17, 1939. On the other hand, plaintiff contends that there was evidence to establish beyond a reasonable doubt that Dr. Erling Ravn was mistaken on July 15 and 17, 1939, as to plaintiff's condition and his

prospects for recovery, and that Dr. Ravn's statements in that respect to plaintiff and Guenzl, who restated them to Horne, were representations made in good faith as to existing facts upon which both parties had a right to rely, and but for which the settlement would not have been made by plaintiff. These contentions are based upon plaintiff's claims that Dr. Erling Ravn was so mistaken in making these statements and representations because he did not then know of the existence of a deep-seated injury to the blood vessels in plaintiff's arm, and that if he had then known thereof, Dr. Ravn would not have advised plaintiff to resume work or make a settlement. Thus, by reason of these contentions and claims, the invalidity of the settlement and release in question depends, in the final analysis, upon whether there existed on July 17, 1939, such a deep-seated injury to the blood vessels in plaintiff's arm; or whether, as defendant claims, the swollen and impaired condition of the arm at the conclusion of plaintiff's work on August 17, 1939, was due to a ruptured biceps tendon as the result of a separate and distinct injury sustained by him while at work on that day, but which was in no way related to his injury on June 30, 1939.

The latter claim is based by defendant largely upon testimony by Dr. A. R. Fehland, whose first examination of the arm was made on March 19, 1940, that plaintiff in giving his history stated that "while working on August 17th, 1939, his right arm 'burst,'" "and suddenly became very painful and discolored;" and that Dr. Fehland's diagnosis, based upon the conditions which he found on his examination, was that plaintiff was now suffering from a rupture of the tendon of the long head of the right biceps muscle, which could be caused by the process of contracting this muscle when lifting or pulling on something, but would not be caused if a person fell forward on both hands. In reaching that conclusion, Dr. Fehland had not, however, had the opportunities of examining plaintiff which Dr. Bjarne Ravn had, while

treating plaintiff from August 17th to August 28th; and which Dr. Erling Ravn had while treating plaintiff after August 28th, as well as from June 30 to July 15, 1939. Based on his examinations during the periods he treated plaintiff, Dr. Bjarne Ravn testified:

"When I examined the plaintiff on August 17th, 1939, the tendon was not ruptured.' The whole arm was swollen and hard, and I couldn't determine the muscle, but the muscle had not slipped down at that time, because there was no hollow space above it there. If the tendon of the biceps muscle has been torn, the biceps muscle would come down immediately. It wasn't down there. If it had slipped down to its present position on August 17th, there would have been an empty space where the muscle formerly was located in the arm. If there had been a hemorrhage at that time, then the blood would have gone in the empty space and it would be soft, but the bunch was very firm. In a few days the skin or subcutaneous tissue softened up enough so I could feel the hard, firm biceps muscle in its normal position. The muscle has not been torn loose from the tendon. . . . I agree with Dr. Fehland that if there had been a tearing of the tendon on August 17th, the muscle would have immediately slipped down to its approximate present condition."

And Dr. Bjarne Ravn testified that in his opinion, "the injury of June 30th had a direct connection to the disability when I saw him in August," and "was the cause of his present disability."

Likewise, based on his examinations during the periods he treated plaintiff, Dr. Erling Ravn testified that he,—

"Examined Schmidtke's arm on August 28th. At that time the biceps muscle was indurated and hard and in its normal position and its shrinking began, the softening of the upper portion of that muscle, which would indicate there was no rupture of the tendon at that time. I at no time found there was any rupture of the tendon itself. . . . The muscle assumed this present position two or three inches below the normal position on the arm about October. As-

sumed this position gradually over a period of some two months. This was caused by a hemorrhage in the upper portion of that muscle close to the attachment of the tendon, which interfered with the blood supply and caused the death or necrosis of the muscle. That was a gradual absorption or pulling down of the remaining muscle. . . . The muscles came down as a result of the hemorrhage, caused by damage to the blood vessels."

And Dr. Erling Ravn testified that in his opinion plaintiff "had an injury to the blood vessels, and the vessels and the muscles that derived therefrom, those vessels gave way, and, in fact, gave way due to the injury which he received on June 30th, in my opinion."

In so far as there may be conflicts between Dr. Fehland's testimony and the testimony given by the Drs. Ravn in respects stated above, the differences may be due to the opportunities which the Drs. Ravn had to examine the plaintiff at earlier periods. But at all events, in view of their earlier examinations and the positive testimony by the Drs. Ravn and their opinions based thereon, that the tendon was not ruptured and the biceps muscle had not slipped down during the period that Dr. Bjarne Ravn treated the plaintiff from August 17 to 28, 1939, and during the time that Dr. Erling Ravn treated him after August 28, 1939, the court could consider their testimony ample to establish beyond a reasonable doubt that the seriously impaired position which Dr. Erling Ravn testified the muscle assumed in October, 1939, and which Dr. Fehland found on March 19, 1940, was not the result of a rupture of a tendon on August 17, 1939, but was caused thereafter, as Dr. Erling Ravn testified, "by a hemorrhage in the upper portion of that muscle close to the attachment of the tendon, which interfered with the blood supply and caused the death or necrosis of the muscle. That was a gradual absorption or pulling down of the remaining muscle."

Consequently, as it is undisputed that Dr. Erling Ravn did not know until after August 28, 1939, of the existence

of the deep-seated injury to the blood vessels, which ulti-
mately resulted in the hemorrhage and impairment of the
biceps muscle and tendon, the evidence warranted the court's
finding that Dr. Erling Ravn was mistaken on July 15 and
17, 1939, as to plaintiff's condition and prospects of recovery,
and that but for that mistake plaintiff and his attorney and
Mr. Horne would not have been misinformed as to plaintiff's
physical condition and ability to resume work, and his claim
would not have been settled by the giving of the release in
question.   Likewise, the court was warranted in finding that
Dr. Erling Ravn's statement as to plaintiff's condition and
prospects of recovery was not a mere expression of opinion
as to future events, but was a representation made in good
faith as to existing facts upon which both the plaintiff and
defendant had a right to rely. And as the representations were
believed to be true and relied upon in good faith by the parties
involved, all of whom were in "unconscious ignorance" of
the mistake, there was applicable the rule that a settlement
and release effected under such circumstances can be set
aside by the court on the ground of mistake of fact.   *Brown
v. Ocean Accident & Guarantee Corp.* 153 Wis. 196, 200,
201, 140 N. W. 1112; *Granger v. Chicago, M. & St. P. R.
Co.* 194 Wis. 51, 215 N. W. 576; *Grand Trunk Western R.
Co. v. Lahiff,* 218 Wis. 457, 261 N. W. 11.

Defendant also contends on this appeal that the court,
in submitting to the jury the issue as to the amount of dam-
ages suffered by plaintiff "subsequent to July 17, 1939," in
connection with a finding by the court in the special verdict
that the damages suffered up to July 17, 1939, were $220,
may have caused the jury to conclude wrongly that no part
of the sum of $220 paid on July 17, 1939, was intended by
the parties to be for future or unknown consequences of the
injury sustained by plaintiff. From a highly technical stand-
point there may be some basis for defendant's contention.
However, as there was no objection to the form in which

the question was worded at the time the court submitted the special verdict to the jury; and as there was no request for an instruction to the jury on the subject, there is no basis in the record upon which to predicate reversible error in this respect. Moreover, as the amount assessed by the jury does not seem excessive, it seems improbable that the jury erred in making the assessment.

*By the Court.*—Judgment affirmed.