JANDRT, Appellant, vs. MILWAUKEE AUTO INSURANCE COMPANY, Respondent.

*October 11—November 15, 1949.*

For the appellant there was a brief by *Rubin & Ruppa,* attorneys, and *Norman W. Wegner* of counsel, all of Milwaukee, and oral argument by *Nathan Ruppa.*

*D. J. Regan* of Milwaukee, for the respondent.

Martin, J.  The question involved on appeal is whether there is any credible evidence to warrant a finding that the release executed by the plaintiff was void because of mutual mistake or fraud.  A careful review of the facts is necessary.

The plaintiff-appellant, Leslie Jandrt, while en route with his wife and child on a short vacation trip from Milwaukee to Bruce, Wisconsin, was injured as a result of a collision between the automobile which he was operating and an automobile operated by defendant's insured. Plaintiff was taken to St. Joseph's hospital in Marshfield, Wisconsin, where he remained about eight days, until July 9, 1940. While he was in the hospital, the hospital officials were anxious about payment of his bill so he telephoned the defendant insurance company and in response to his call, the defendant company sent an adjuster to Marshfield. Plaintiff was released from the hospital about 9 a. m. on July 9, 1940, and met the adjuster at Marshfield about 6 p. m. on that date.

Plaintiff testified that: He did not feel good and was dizzy and sick all day. The adjuster introduced himself as a representative of the defendant insurance company and the two of them first went to see the traffic officer who had investigated the accident. The traffic officer told them that the defendant's insured admitted that he was intoxicated and sleeping at the time of the accident and that the accident was entirely his fault. They next went to the garage and got estimates on the damages to plaintiff's automobile, then to the hospital to get the amount of the hospital bill and doctor bill, and then the adjuster took the plaintiff to dinner at the hotel. At the hotel room they figured the car damage at $382; hospital·bill, $48; and doctor bill $40, or a total of $470. Plaintiff then testified he told the adjuster:

"I said I didn't want to settle no case because I didn't know how I would come out of it. He said '*Well, after a vacation and rest, you will be all right.*'"

and further:

"I didn't want to sign. I was too sick and tired to know what I was doing and didn't want to sign anything but I knew I would have to straighten things out. I wanted it to pay the doctor and my car. . . ."

"*Q.* What about the release? Did he give you some papers to sign? *A.* Yes; he gave me some papers to sign. I think those were the papers. . . . I didn't know what a release was then. I thought it was the customary papers I had to sign when I was doing business with him. The hospital, they were interested in getting their money. They wanted to know where the money was coming from. They were asking me about every day who was to pay the bills; who was to be held responsible. I told them that the man admitted he was responsible and he had insurance.

"*Q.* What other talk did you have with Mr. Landers about signing the release? *A.* Nothing of importance that I know of.

"*Q.* You signed the release here? *A.* Yes; he laid it in front of me and I signed it. . . .

"*Q.* Was there any other talk in the event you didn't want to sign the release? *A.* Several times I told him 'I don't want to settle.' He says 'We may as well settle the whole thing now while we are here together.' I told him I didn't want to settle it because I didn't feel good enough to settle. He said '*Lots of times if you don't settle these matters, we put them on the shelf and it takes years to settle.*' I told him I didn't care about that—something on that order. I don't know whether that is the exact words. I didn't want to settle yet. . . ."

"*Q.* Landers didn't force you to sign the release, did he? *A.* He didn't force me to sign anything. He just put it there and I signed it.

"*Q.* You could have refused to sign it? *A.* I could have but I would not have got the money for the hospital and doctor and my car.

"*Q. Your doctor told you not to settle, didn't he? A. I think he did.*

"*Q.* Did you read the papers before you signed them? *A.* No. He just laid them there."

Defendant contends that the release signed by plaintiff on July 9, 1940, is effectual to bar the claim of plaintiff. This document has in bold letters, before other recitals, the statement "Release Of All Claims," and in the lower right-hand corner above the line for signature has in bold letters the

words "Caution! Read Before Signing." It recites in substance that upon the payment of $470, plaintiff releases John L. Morginski and Milwaukee Auto Insurance Company "from any and all actions, causes of action, claims, demands, damages, costs, loss of services, expenses and compensation . . . resulting or to result from accident that occurred on or about the 30th day of June, 1940. . . ."

Dr. Lyman A. Copps, who examined and treated plaintiff while he was in the hospital, found lacerations and injury to the left eye and blood within the left eyeball. He testified that at the time the plaintiff left the hospital he seemed to be in good condition but returned on June 20, 1941, complaining of headaches, dizziness, and occasional nausea. He then found that there was a limitation of the fields of vision which indicated an intercranial injury. The last record he had of seeing plaintiff was on July 27, 1942.

Exhibit 1 is a letter, dated August 14, 1941, from Dr. Copps to plaintiff which reads in part as follows:

"The only record I have in which I recommend postponing the settlement of your claim is in the examination on June 20, 1941."

Exhibit 2 is a letter, dated October 14, 1941, from Dr. Copps to plaintiff's counsel which states:

"At that time I recommended that Mr. Jandrt postpone settlement of his claim."

Dr. Copps' testimony was:

"*Q.* Now, this time that you said you advised him to defer settlement, so that there is no misunderstanding, that is when? During the time he was in the hospital under your care? *A.* Oh, no. That is when he came back later.

"*Q.* Well, just when was that? A. What is the date of that letter?

"*Q.* That was in 1941, wasn't it? *A.* Yes.

"*Q.* Was it? *A.* That letter was dated October 14, 1941. That was based on my examination of June 20, 1941.

"*Q.* Well, now, doctor, referring to defendant's Exhibit 2, . . . At what time was that? *A.* That was——. I think perhaps I have not made myself very clear there. Let me get some dates. That would refer to my discharge—on July 8, 1940, at the time I discharged him from the hospital.

"*Q.* When you say 'at that time' in Exhibit 2, aren't you referring to the period while he was in the hospital? *A.* Yes, sir.

"*Q.* So that prior to his discharge from the hospital on July 8, 1940, you had advised him to defer settlement; is that right? *A.* Right.

"*Q.* Had you advised him to that effect once or more than once or at least once? *A.* At least once.

"*Q.* What, if anything, did he say to you when you gave him that advice? *A.* I regret, I don't remember.

"*Q.* Now then, in Exhibit 2—Exhibit 1 rather, which is a letter from you to Mr. Jandrt dated August 14th, you refer to your examination of June 20, '41, don't you? *A.* I have not seen that. May I see that letter?

"*Q.* Oh, yes. Pardon me. *A.* I apparently have contradicted myself and I am inclined to think that in Exhibit 2 what I said was referring back to my examination on June 20, 1941.

"*Q.* Which is correct? When did you advise him to defer settlement? *A.* I am very sorry. I don't recall the dates and I didn't keep records of all the conversations on it.

"*Q.* Wasn't it while he was under your care? *A.* Yes.

"*Q.* And in the hospital? *A.* Probably.

"*Q.* Yes. There is not much doubt in your mind but that it was during the time he was in the hospital? *A.* Except in Exhibit 2, I refer back to another letter.

"*Q.* Don't you remember at one time that the adjuster went with Mr. Jandrt to your office and talked to you about it and got the amount of the bill at your office? Do you remember that? *A.* I am very sorry. It might seem ridiculous but I don't remember it."

While the testimony of the doctor was somewhat confused as to dates, taking into consideration plaintiff's own testimony that he was advised not to settle, which we have set out above, it is clear that the plaintiff was cautioned before he left the hospital not to enter into an agreement of settlement.

In view of this evidence, it can hardly be said that the statement of the insurance adjuster ("After a vacation and rest, you will be all right") misled the plaintiff.

See *Granger v. Chicago, M. & St. P. R. Co.* (1927), 194 Wis. 51, 215 N. W. 576, and *Schmidtke v. Great Atlantic & Pacific Tea Co.* (1940), 236 Wis. 283, 294 N. W. 828, for examples of a release void because of mutual mistake.

In the present case the plaintiff entered into this settlement and signed the release even though he had been advised to postpone any settlement.

It is undisputed that the plaintiff told the adjuster that he did not wish to settle for the full amount and that the adjuster told him that the company would not make a partial settlement but that it would have to be for the full amount. During the course of this discussion, the adjuster made the statement: "Lots of times if you don't settle these matters, we put them on the shelf and it takes years to settle." Plaintiff then told the adjuster that he didn't care about that—"I didn't want to settle yet."

The jury found that plaintiff was induced by reason of that statement to sign the release.

It was stated in *International Milling Co. v. Priem* (1923), 179 Wis. 622, 624, 192 N. W. 68:

"To be actionable the false representation must consist, first, of a statement of fact which is untrue; second, that it was made with intent to defraud and for the purpose of inducing the other party to act upon it; third, that he did in fact rely on it and was induced thereby to act, to his injury or damage." (Cases cited.)

In *Prime Mfg. Co. v. Allen-Hough C. Co.* (1933), 210 Wis. 72, 245 N. W. 70, it was held that misrepresentations, to be actionable, must not only relate to something material, but must also be believed, relied on, and have deceived the party to whom made.

In *Schiefelbein v. Fidelity & C. Co.* (1909), 139 Wis. 612, 615, 120 N. W. 398, the question was whether the plaintiff

was induced to sign a release of a claim for personal injuries by fraud, and it was held that to impeach a formal written release on the ground of fraud or mistake the proof must be clear and convincing beyond reasonable controversy. See also *Demark v. Milwaukee E. R. & L. Co.* (1910), 142 Wis. 624, 628, 126 N. W. 13.

In *Hanley v. Hines* (1922), 176 Wis. 252, 257, 186 N. W. 602, the court stated:

"Compromise settlements are greatly favored in the law, and when made, particularly when evidenced by writings signed by the claimant, cannot be impeached on the ground of fraud or mistake unless the evidence clearly and convincingly, beyond reasonable controversy, establishes such mistake or fraud. [Cases cited.]

"True, the burden of proof on a settlement of this kind is upon the defendant; but when a proper release, duly executed and signed, has been shown by the defendant, such settlement has not only been presumptively shown, but can only be overcome by evidence in the case on the part of the plaintiff which, as above stated, is clear, satisfactory, and convincing beyond reasonable controversy."

It was stated in *Miller v. Paine Lumber Co.* (1930), 202 Wis. 77, 86, 227 N. W. 933, 230 N. W. 702:

"While this court is not partial to contracts of settlement made with employees with unseemly and often indecent haste for trifling amounts when their physical and mental condition was such that they were unable to intelligently comprehend what they were doing (*Schweikert v. John R. Davis L. Co.* 147 Wis. 242, 249, 133 N. W. 136), yet such settlements are favored in the law when fairly made, and such settlements cannot be impeached on the ground of fraud or mistake except on clear and convincing evidence beyond reasonable controversy. *Hanley v. Hines,* 176 Wis. 252, 186 N. W. 602. Nor is such a settlement to be overcome by a mere statement of the signer that he did not understand the nature of the document which he signed. *Rayborn v. Galena Iron Works Co.* 159 Wis. 164, 149 N. W. 701. If the only evidence in the case to establish fraud was the statement of the plaintiff that he did not understand the document which he signed, that

would not be sufficient to impeach the receipt, and would present no jury question."

An inadequate consideration is given considerable significance, if supported by other evidence, in establishing fraud, mistake, etc. However, in the present case the evidence shows no unconscionable advantage taken by the defendant's adjuster. There were no misrepresentations which plaintiff relied on. Plaintiff was warned by his physician not to settle. The adjuster did not represent himself as one having special knowledge of the physical condition of the plaintiff. The plaintiff was not urged to sign the release. In fact, outside of the inadequacy of the consideration, the plaintiff has no evidence of any nature to uphold his claim.

In cases cited by plaintiff, other elements were present. We find no case, and are referred to none, that holds inadequacy of the consideration alone is sufficient to set aside the release. In *Madison Trust Co. v. Helleckson* (1934), 216 Wis. 443, 257 N. W. 691, the statements as to liability were made by an attorney about material facts especially within his knowledge as an attorney, which statements were misrepresentations.

There are numerous cases supporting the doctrine that a release of a claim for personal injuries cannot be avoided on the ground of mistake, merely because the injuries prove more serious than the releasor at the time of executing the release believed them to be. See cases cited 48 A. L. R. 1464, II *b*.

*Allison v. Wm. Doerflinger Co.* (1932), 208 Wis. 206, 242 N. W. 558, cited by plaintiff, is distinguished here for in that case the adjuster who procured the release represented himself as a lawyer experienced in the law of negligence. He made positive statements of nonliability of defendant store owner and false representations as to plaintiff's physical condition. His misrepresentations regarding matters of law by

one professing knowledge thereof, and thereby obtaining unconscionable advantage over one not in a position to become informed, entitled the injured party to relief.

We have carefully reviewed the evidence in this case and hold that as a matter of law the statements made by defendant insurance company's adjuster do not constitute false or fraudulent representations and do not furnish ground for making void the written release.

*By the Court.*—Judgment affirmed.