J. A. OAKES, Appellant, v. THE CHICAGO, BURLINGTON &
QUINCY RAILROAD COMPANY, et al., Appellees.

**Railroads:** INJURY TO PASSENGER: SETTLEMENT: MENTAL CAPACITY:
EVIDENCE. In this action for injury to plaintiff while a passenger
on defendant's train, the evidence is reviewed and held insuffi-
cient to show that plaintiff was mentally incompetent when he
made a settlement for his injuries, but rather that he fully com-
prehended and appreciated his acts in accepting a check in settle-
ment and in his use and disposition of the proceeds of the
check.

*Appeal from Lucas District Court.*—Hon. F. W. EICH-
ERLBERGER, Judge.

THURSDAY, OCTOBER 24, 1912.

ACTION for damages for personal injuries. At the
close of the evidence, the trial court directed a verdict for
the defendants. Plaintiff appeals. *Affirmed.*

*W. W. Bulman,* and *J. A. Penick,* for appellant.

*Stuart & Stuart,* for appellees.

EVANS, J.—Plaintiff averred in his petition that on
May 2, 1910, he was injured through the negligence of
the defendant's employees while riding as passenger on
one of its trains. He also averred that about five weeks
later a contract of settlement and release was fradulently
obtained from him by the defendant while he was men-
tally incapacitated as the result of such injury. It ap-
peared from the evidence that immediately following
the accident the nature and extent of plaintiff's injury
was not easily ascertainable. There were no broken bones
nor visible marks. The accident occurred in Missouri. The
plaintiff went to a hospital at St. Joseph and there re-
mained for about five weeks at the expense of the defendant
company. At the close of this period, the purported con-
tract of settlement was entered into whereby the defen-
dant company agreed to pay the plaintiff $1,212. It
delivered to him its check or voucher therefor in pursu-
ance of the agreement of settlement. It is the claim of
the plaintiff that he knew nothing of such contract of
settlement, and that he signed the same while in a state
of practical unconsciousness. The plaintiff left the hos-
pital and went to Trenton, Mo., his former home. While
there he claims to have discovered for the first time that

he had possession of defendant's check for the amount of the settlement. He immediately consulted with an attorney in such town, one Hubbell, and left the check with him to be returned to the defendant. Hubbell immediately returned the same with the following letter: "Hon. O. M. Spencer, General Solicitor C. B. Q. Ry. Co., St. Joseph, Mo.—Dear Sir: Herewith I am returning to you draft No. 2946 dated June 6th, 1910, in the sum of twelve hundred and twelve dollars ($1212.00) issued to my client Mr. Jesse A. Oakes. Mr. Oakes was severely injured at Ridgeway, Missouri, on May 2d, 1910, and this draft was given to him in settlement, at St. Joseph, and he signed a release, which settlement was made and which release was signed under such circumstances that I deem the whole transaction voidable in law—not binding on anyone —and very far from what is just and right. If your company desires to take up an equitable settlement of this case, Mr. Oakes will be glad to settle the case fairly; otherwise it is a matter that will have to be determined by the courts. Very respectfully, [Signed] Platt Hubbell." The defendant returned the check to Hubbell, insisting upon the regularity of settlement. To such letter Hubbell replied as follows: "June 16, 1910. O. M. Spencer, St. Joseph, Mo.—Dear Sir: After Mr. Oakes had returned home and had rested awhile and being under the care of his home physician, he felt some better and decided he had rather take the draft than to bring suit. Therefore he will have the draft cashed and the incident will be closed. Very respectfully, Platt Hubbell." The plaintiff denies the authority of Hubbell to write the second letter, and denies that he was acting as attorney for him when he wrote the same. It is undisputed, however, that the plaintiff did receive back from Hubbell the check or draft, and on June 24th following he cashed the same at Chariton, Iowa, by indorsement thereof to the Chariton Nat-

ional Bank. He received from such bank $12 in currency and a certificate of deposit for $1,200. Later such certificate of deposit was deposited to his credit in another bank, and the proceeds thereof were drawn and used by him in various ways. The trial court held that the plaintiff had thereby waived the fraud if any in the settlement and waived his right to repudiate the same; and that his conduct subsequent to the discovery of the alleged fraud amounted to a ratification of the settlement. Upon the face of the record, such holding was manifestily correct, and in accord with the authorities hereinafter cited.

As avoiding the effect of this apparent conduct, however, it was the contention of the plaintiff that he was mentally incapacitated when he cashed the check, and that that also was done without conscious knowledge on his part. The question before us at this point, therefore, is whether the evidence would sustain a finding of mental incapacity in the plaintiff in the matter of cashing the check and using the proceeds thereof. The direct evidence of the plaintiff at this point was as follows:

Q. What, if anything, did you do with the check? A. Well, I don't remember exactly what I did with it. Q. What have you learned that you did with it? A. I heard I cashed it. Q. What, if anything, did you do with the money? A. Well, I don't know altogether what I did do with it. I paid some of my expenses. Q. Can you account for considerable of it? A. Yes, sir. Q. Do you remember the occasion of your cashing it? A. No, sir; I don't remember when I cashed it exactly. Q. Do you remember at what bank you cashed it? A. No, sir. (On cross-examination he testified as follows): 'Q. Where was Mr. Hubbell when you saw him? A. In his office. Q. How did you happen to go there? A. Because I didn't want that check when I found out I had that check. Q. You went to him knowing him to be a lawyer? A. Yes, sir. Q. You placed the check in his hands? A. Yes, sir. Q. Then in a few days you got the check back? A. I told him to return the check. Q. He got it back some way,

and gave it to you again? A. Yes, sir. Q. What did you do with it then? A. He told me that they would not accept it, and for me to take it and cash it. Q. Then you came to Chariton? A. Yes, sir; shortly afterwards I came to Chariton? Q. Where did you take that check? What did you do with that check? A. Well, I don't remember just what I did do with the check. Q. What do you think you done with that check? A. Well, I was told it was cashed. Q. Where did you take it? A. I don't know; to some bank I think. Q. Are you acquainted with Mr. J. C. Copeland? A. Well, just slightly. Q. You knew him when you saw him? A. I don't know positive. Q. You know he is an officer? A. I only know he belongs to the bank. Q. Did you have a conversation with him when you gave him the check? A. I don't remember. Q. Did he give you any money in any shape whatever? A. I don't remember. Q. Don't you know just as well as you know you are living that he gave you a certificate of deposit for $1,212? A. No, sir; I do not. Q. Have you found out since that he gave you a paper? A. Yes, sir; I understand he has. Q. When did you first find out that he had given you a certificate of deposit for this check? A. Since this lawsuit was begun. Q. You came to your senses about the time this suit was commenced, did you? A. No, sir; not any more than any other time. Q. Are you crazy yet? A. No, sir; not at present. Q. I will ask you if you are sane at this time? A. No, sir; I am not entirely sane. Q. You have answered a good many questions, haven't you? A. Yes, sir; but I have been preparing for this. Q. For this case? A. Yes, sir; I have been taking a rest cure and trying to regain my thoughts. Q. You did find out that you had this check? A. I don't know positive, only I heard I had. Q. Didn't you get something for this check? A. Not that I know of. Q. Haven't you found out since that you did? A. I heard I had. Q. Did you go back to Trenton after you came here? A. Yes, sir. Q. What did you go back to Trenton for? A. I believe I went back there to see Dr. Winingham. Q. After you left the hospital and came up here, you say you went back to Trenton to see Dr. Winingham? A. Yes, sir. Q. How long did you stay in Trenton at that time? A. Well, I

don't remember exactly, but I think one night. Q. Then where did you go? A. I came back to Chariton. Q. What money did you have at the time you were injured? A. I didn't have any, only a few cents of expense money that the house had furnished me. Q. You haven't earned any money since then? A. Not one cent. Q. You had no property, did you? A. No, sir. Q. You had no home? A. No, sir. Q. Don't you know he gave you a certificate of deposit for $1,212, and you took it to the Savings Bank here and deposited it? A. No, sir; I don't know it. Q. Do you say you haven't any money in the Savings Bank today? A. Yes, sir; I say I have no money there today. Q. Have you checked it all out? A. Yes, sir. Q. For what purpose did you check it out? A. For sickness, nurse hire, and doctor bills. Q. The entire $1,212? A. I don't know. I know I ain't got any of it now, not to my knowledge. Q. How did you pay out this money? A. I don't remember. Q. Did you issue checks on the bank? A. Well, I did for awhile, while I was up and around. Q. What time was you up and around? A. Well, I was up and around when I first came here for awhile. Q. What portion of the time since you came up here from the hospital that you would walk around town with the aid of a cane? A. Well, the first few months while I was here part of the time. Q. That would be July, August, and September, would it? A. I think so. Q. This time that you were walking around town did you draw some checks on the Savings Bank? A. Yes, sir. I kind of think I did. Q. How many do you think you drew? A. I don't know. Q. That was when you was walking around? A. Yes, sir. Q. How did it occur to you that you had money there to draw against? A. Well, I went in there to get some change. and they wanted to know of me if I didn't have some money there, and I told them I didn't know. Q. They wanted to know if you didn't have some money in their bank? A. Yes, sir. Q. What did you say? A. I told them I didn't know. Q. Then what did they say? A. They says you have. Q. Did they tell you how much? A. No, sir. Q. Did you ask how much? A. I don't remember. Q. Why didn't you ask how much? A. I don't remember. Q. That was a surprise to you, was it not, that you had some money in the bank? A. Yes, sir; it was.

Q. Then you went to work to find how you got it there, didn't you? A. No, sir. Q. Why didn't you? A. I didn't care how I got it. Q. Do you have any idea who put that money there for you? A. I didn't know but my brother did. Q. Did you ask him? A. Yes, sir; but he said he didn't. Q. Then it was a mystery to you how that money got there? A. Yes, sir. Q. Did you ask the bank how much it was some fellow had left there? A. I don't re-member of ever asking. Q. Why didn't you? A. Because I have got money in the bank, I don't go and ask the banker how much I have got. I just go there and check it. Q. You usually know? A. No, sir. He notifies me how much I have got when it is all checked out. Q. You never pay any attention yourself to how much money you have got in the bank? A. No, sir. Q. Suppose there is money in the bank that you can't account for at all, $1,212? A. I didn't know. Q. You thought it was there? A. No, sir. Q. How much did you think there was of it? A. I didn't know. Q. I am asking you why you didn't inquire? A. Because I didn't consider that any of my business. As long as I have got money, that is all I care. If I pay my bills, that is all I care. Q. Then some fellow without your knowledge and consent had gone there and left a lot of money for you? A. Yes, sir. Q. You say that is none of your business? A. As long as it was for me, that is all I care. Q. That was not a very common thing for people to come around and deposit money in the banks for you? A. Yes, sir; I have had that done before. Q. And you never would find out where it came from? A. I didn't care. Q. Don't you know that is all a mistake? Don't you know you took that money there and deposited it? A. No, sir; I don't. Q. I am going to give you another chance to explain to this jury after you found quite a large sum of money had been deposited in the bank why you didn't take some steps to find out where it came from. A. Because I didn't care. Q. Did you suppose some fellow was giving you that money? A. I didn't know what to suppose. Q. That never bothered you enough? A. I have had lots of money. Q. You thought some fellow had given this to you? A. Yes, sir.

Plaintiff's testimony in his own behalf in response to

the examination of his counsel evinces indisputable consciousness of all the events and circumstances which tend to the proof of his case. His cross-examination evinces the same thing, notwithstanding his formal denials. To illustrate: The deposit of the $1,212 check was made with Copeland, cashier of the Chariton National Bank, who was called as a witness by defendant, and who testified to the circumstances. The plaintiff rebutted this testimony as follows:

Q. Why did you ask Mr. Copeland whether or not your creditors could get that money if you left it in his bank? A. I didn't. Q. That statement isn't true then? A. No, sir; that is a lie. Q. Did you talk to him at all about any person getting your money? A. I did not, sir; not a word. Concerning his attorney and the receipt of the check from him, he testified as follows: 'Q. Do you remember of this lawyer, Platt Hubbell at Trenton? A. Yes, sir; I do. Q. When you gave the check back that you have told about, what, if anything, did you say about employing him any further? A. He had a letter in his hand, and he pulled a check out. I think there was two letters in one envelope. He says, 'Here is your check.' I said, 'All right. I am done with you. I don't want any more transactions whatever with you. The Burlington bought you off.'

Reading the plaintiff's testimony as a whole, we are clear that it furnishes no support to the contention that he acted unconsciously in receiving the check from his attorney and in cashing the same at the Chariton National Bank. His conscious knowledge of his act is disclosed too unmistakably by his own testimony, and this sometimes while in the act of denial.

Upon this state of the record, the case comes squarely within our previous cases, and is quite controlled thereby, and the trial court properly so held. *Coles v. Terminal R. R. Co.,* 124 Iowa, 56; *Keck v. Insurance Co.,* 89 Iowa, 200; *Wallace v. C., M. & St. Paul Ry. Co.,* 67 Iowa, 547;

*Nason v. Ry. Co.*, 140 Iowa, 533; *Petersen v. Ry. Co.*, 36 Minn. 399 (31 N. W. 515.)

Our conclusion at this point is decisive of the case, and we need not consider other features thereof.

The judgment below is accordingly *affirmed*.