# JOHN W. POPE v. BAILEY–MARSH COMPANY.

(151 N. W. 18.)

**Written agreement of settlement and release — avoidance of — fraud and misrepresentation — evidence — clear and convincing beyond reasonable controversy.**

1. In order to warrant the avoidance of a formal written agreement of settlement and release upon the grounds of fraud and misrepresentation, the evidence of such fraud or misrepresentations must be clear and convincing and beyond reasonable controversy.

**Proof — degree of — to impeach such settlement — contract — mental incapacity to make.**

2. The same degree of proof is required in order to successfully impeach such settlement and release upon the ground of mental incapacity of plaintiff to enter into such contract.

**Settlement and release — avoidance — evidence insufficient to warrant directed verdict — motion for — judgment notwithstanding the verdict — motion for.**

3. Evidence examined and held insufficient to warrant the court or jury in avoiding such settlement and release, and it was accordingly error to deny defendant's motions for a directed verdict and for judgment notwithstanding the verdict.

Opinion filed December 14, 1914. Rehearing denied February 9, 1915.

Appeal from District Court, Pierce County, *A. G. Burr, J.*

From a judgment in plaintiff's favor and from an order denying defendant's motion for judgment notwithstanding the verdict, defendant appeals.

Reversed, with directions to dismiss the complaint.

*Polda, Aaker, & Greene (Walson & Abernethy, of counsel),* for appellant.

The plaintiff assumed all the risks of the employment. Choctaw, O. & G. R. Co. v. Jones, 7 Ann. Cas. 439, note; Umsted v. Colgate Farmers' Elevator Co. 18 N. D. 309, 122 N. W. 390; Rev. Codes 1905, § 5544; 4 Thomp. Neg. § 4640, and cases cited.

The test is not whether plaintiff knew and comprehended the dan-

ger, but whether, under the circumstances, he had the means of knowledge and ought to have known and comprehended it. Klatt v. N. C. Foster Lumber Co. 92 Wis. 622, 66 N. W. 791; Hughes v. Winona & St. P. R. Co. 27 Minn. 137, 6 N. W. 553; Renne v. United States Leather Co. 107 Wis. 305, 83 N. W. 473; Ragon v. Toledo, A. A. & N. M. R. Co. 97 Mich. 265, 37 Am. St. Rep. 336, 56 N. W. 612; Day v. Cleveland, C. C. & St. L. R. Co. 137 Ind. 210, 36 N. E. 854; Louisville & N. R. Co. v. Hall, 91 Ala. 112, 24 Am. St. Rep. 863, 8 So. 371; Pennsylvania Co. v. Ebaugh, 152 Ind. 531, 53 N. E. 763; Hill v. Meyer Bros.' Drug Co. 140 Mo. 433, 41 S. W. 909, 3 Am. Neg. Rep. 229; Taylor–Craig Corp. v. Hage, 16 C. C. A. 339, 32 U. S. App. 548, 69 Fed. 581; Union P. R. Co. v. Monden, 50 Kan. 539, 31 Pac. 1002; Haley v. Jump River Lumber Co. 81 Wis. 412, 51 N. W. 321, 956; Muldowney v. Illinois C. R. Co. 39 Iowa, 619, 14 Am. Neg. Cas. 612; Aldridge v. Midland Blast Furnace Co. 78 Mo. 559.

The negligence of the plaintiff was not only a proximate cause of his injury, but except for his own negligence he would not have been injured. Heckman v. Evenson, 7 N. D. 173, 73 N. W. 427; Morrison v. Lee, 16 N. D. 377, 13 L.R.A.(N.S.) 650, 113 N. W. 1025; Beach, Contrib. Neg. § 7; Davis v. Western R. Co. 107 Ala. 626, 18 So. 173; Thoman v. Chicago & N. W. R. Co. 92 Iowa, 196, 60 N. W. 612; Miller v. Grieme, 53 App. Div. 276, 65 N. Y. Supp. 813; Knorpp v. Wagner, 195 Mo. 637, 93 S. W. 961; 4 Thomp. Neg. § 4629.

A full and complete, valid settlement, release and payment for all claims of plaintiff for damages was made prior to the commencement of this action. There was no legal evidence sufficient to show the incapacity of the plaintiff, nor to sustain the claim of fraud and misrepresentation in obtaining the release. A mere preponderance of the evidence is not sufficient to establish such fraud or mistake as will avoid a written release, as it can only be avoided by clear, convincing, and unequivocal proof,—proof beyond all reasonable question. 6 Thomp. Neg. § 7384; Jasper v. Hazen, 4 N. D. 1, 23 L.R.A. 58, 58 N. W. 454; Riley v. Riley, 9 N. D. 580, 84 N. W. 347; Carter v. Carter, 14 N. D. 66, 103 N. W. 425; Anderson v. Anderson, 17 N. D. 275, 115 N. W. 836; Schweikert v. John R. Davis Lumber Co. 147 Wis. 242, 133 N. W. 136; Chicago & N. W. R. Co. v. Wilcox, 54 C. C. A. 147, 116 Fed. 913; Bessey v. Minneapolis, St. P. & S. Ste. M. R. Co.

154 Wis. 334, 141 N. W. 244; Oakes v. Chicago, B. & Q. R. Co. 157 Iowa, 15, 137 N. W. 1062.

In actions at law this rule is slightly modified. Prondzinski v. Garbutt, 8 N. D. 191, 77 N. W. 1012.

Defendant's request that the court instruct the jury "that if plaintiff had the capacity and opportunity to read the release and failed to do so, he is estopped by his own negligence to claim that same was not binding on him," should have been granted and the jury so charged. Wallace v. Chicago, St. P. M. & O. R. Co. 67 Iowa, 547, 25 N. W. 772; Pederson v. Seattle Consol. Street R. Co. 6 Wash. 202, 33 Pac. 351, 34 Pac. 665, 7 Am. Neg. Cas. 77; Hartley v. Chicago & A. R. Co. 214 Ill. 78, 73 N. E. 398; Rutherford v. Rutherford, 55 W. Va. 56, 47 S. E. 240.

Plaintiff retained the benefits of the contract of release and settlement, with a full knowledge of all the facts, without offer to return them, either before suit or after, and such acts amount to a full ratification of the settlement. Laird v. Union Traction Co. 208 Pa. 574, 57 Atl. 897; Grymes v. Sanders, 93 U. S. 55, 23 L. ed. 798, 10 Mor. Min. Rep. 445; Crooks v. Nippolt, 44 Minn. 239, 46 N. W. 349; Johnson v. Burnside, 3 S. D. 230, 52 N. W. 1057; Northwestern Mut. Hail Ins. Co. v. Fleming, 12 S. D. 36, 80 N. W. 147; Fahey v. Detroit United R. Co. 160 Mich. 629, 125 N. W. 704; Gibson v. Western New York & P. R. Co. 164 Pa. 142, 44 Am. St. Rep. 594, 30 Atl. 308; Carroll v. United R. Co. 157 Mo. App. 247, 137 S. W. 303; Och v. Missouri, K. & T. R. Co. 130 Mo. 27, 36 L.R.A. 442, 31 S. W. 962; Johnson v. Merry Mt. Granite Co. 53 Fed. 569; Vandervelden v. Chicago & N. W. R. Co. 61 Fed. 54; Barker v. Northern P. R. Co. 65 Fed. 460; Brainard v. Van Dyke, 71 Vt. 359, 45 Atl. 758; Conrad v. Keller Brick Co. 79 Ohio St. 461, 87 N. E. 1134; Joslyn v. Empire State Degree of Honor, 145 App. Div. 14, 129 N. Y. Supp. 563.

*E. R. Sinkler,* for respondent (*Greenleaf, Bradford, & Nash,* of counsel).

The question whether the servant should have been informed as to his surroundings is for the jury, whenever there is evidence tending to show that it was a proper case for such instructions, and where definite conclusions may be reasonably drawn from the testimony. Richardson v. Swift & Co. 37 C. C. A. 557, 96 Fed. 699; New Orleans

Ice Co. v. O'Malley, 34 C. C. A. 233, 92 Fed. 108; Nyback v. Champagne Lumber Co. 33 C. C. A. 269, 63 U. S. App. 519, 90 Fed. 774.

An employee cannot be said as a matter of law to have assumed the risk incident to his employment unless such assumption is shown by undisputed evidence, or is so clearly proven that no reasonable inference can be drawn to the contrary. Hollinshead v. Minneapolis, St. P. & S. Ste. M. R. Co. 20 N. D. 642, 127 N. W. 993; Revolinski v. Adams Coal Co. 118 Wis. 324, 95 N. W. 122, 14 Am. Neg. Rep. 244.

The question is not whether plaintiff was aware of the conditions which produced the danger, but whether he understood the danger itself. McDonald v. Chicago, St. P. M. & O. R. Co. 41 Minn. 439, 16 Am. St. Rep. 711, 43 N. W. 380.

When the servant is ordered by one in authority to perform an act, and the peculiar risk of the act is not obvious to the servant, and he has not been warned of the danger by the master or by the one in authority under him, the servant has the right to assume that he is not being sent into any unusual peril, and if, while in the exercise of due care, he is injured in the performance of such act, he did not assume the risk incident to the act. Daubert v. Western Meat Co. 135 Cal. 144, 67 Pac. 133; Merrifeld v. Maryland Gold Quartz Min. Co. 143 Cal. 65, 76 Pac. 710; Brazil Block Coal Co. v. Gaffney, 119 Ind. 455, 4 L.R.A. 850, 12 Am. St. Rep. 422, 21 N. E. 1102; Ferren v. Old Colony R. Co. 143 Mass. 197, 9 N. E. 608, 15 Am. Neg. Cas. 481; Brown v. Ann Arbor R. Co. 118 Mich. 205, 76 N. W. 407; Cook v. St. Paul, M. & M. R. Co. 34 Minn. 45, 24 N. W. 311, 16 Am. Neg. Cas. 247; Linderberg v. Crescent Min. Co. 9 Utah, 163, 33 Pac. 692.

Knowledge of a defect, imperfection, or unfitness will not defeat the employee; he must have knowledge of the risk or danger. Thompson v. Chicago, R. I. & P. R. Co. 86 Mo. App. 141; Eichholz v. Niagara Falls Hydraulic Power & Mfg. Co. 68 App. Div. 441, 73 N. Y. Supp. 842; affirmed in 174 N. Y. 519, 66 N. E. 1107; Southwestern Teleph. Co. v. Woughter, 56 Ark. 206, 19 S. W. 575, 13 Am. Neg. Cas. 286; Umsted v. Colgate Farmers' Elevator Co. 18 N. D. 309, 122 N. W. 390; 1 Labatt, Mast. & S. 279a; Union P. R. Co. v. Jarvi, 3 C. C. A. 433, 10 U. S. App. 439, 53 Fed. 65; Davis v. St. Louis, I. M. & S. R. Co. 53 Ark. 117, 7 L.R.A. 283, 13 S. W. 801; Myhan v. Louisiana Electric Light & P. Co. 41 La. Ann. 964, 7 L.R.A. 172, 17 Am. St.

Rep. 436, 6 So. 799; Stiller v. Bohn Mfg. Co. 80 Minn. 1, 82 N. W., 981; Schall v. Cole, 107 Pa. 1; Huddleston v. Lowell Machine Shop, 106 Mass. 282.

Where the master selects a coservant in his employment to instruct and qualify the servant for the new and more dangerous service, the master must select a competent instructor, and be and is liable for his incompetency or negligence while on such duty. In such case, where the servant is injured, the master is liable. Brennan v. Gordon, 118 N. Y. 489, 8 L.R.A. 818, 16 Am. St. Rep. 775, 23 N. E. 810, 24 N. E. 1105; Pullman's Palace Car Co. v. Harkins, 5 C. C. A. 326, 17 U. S. App. 22, 55 Fed. 932; Verdelli v. Gray's Harbor Commercial Co. 115 Cal. 517, 47 Pac. 364, 1 Am. Neg. Rep. 6; Coffeyville Vitrified Brick & Tile Co. v. Shanks, 69 Kan. 306, 76 Pac. 856; Baumann v. C. Reiss Coal Co. 118 Wis. 330, 95 N. W. 139; Carlson v. Northwestern Teleph. Exch. Co. 63 Minn. 428, 65 N. W. 914.

Where the risk incurred by the employment is latent or not usual to such employment, the burden of proof is upon the employer to show that the injured employee knew or ought to have known of the danger. National Steel Co. v. Hore, 83 C. C. A. 578, 155 Fed. 62; Madden v. Saylor Coal Co. 133 Iowa, 699, 111 N. W. 57; Swoboda v. Ward, 40 Mich. 420, 16 Am. Neg. Cas. 1; Thompson v. Great Northern R. Co. 70 Minn. 219, 72 N. W. 962; Stephens v. Elliott, 36 Mont. 92, 92 Pac. 45; Walker v. McNeill, 17 Wash. 582, 50 Pac. 518; Nadau v. White River Lumber Co. 76 Wis. 120, 20 Am. St. Rep. 29, 43 N. W. 1135; 34 Century Dig. § 907.

Where the evidence concerning a servant's knowledge of defects or risks is conflicting, it is for the jury to determine the facts. Hollinshead v. Minneapolis, St. P. & S. Ste M. R. Co. 20 N. D. 642, 127 N. W. 993; Balhoff v. Michigan C. R. Co. 106 Mich. 606, 65 N. W. 592.

Where the complaint raises no issue of assumed risk, the burden is upon the employer to allege and prove the same. Galveston, H. & S. A. R. Co. v. Parish, — Tex. Civ. App. —, 93 S. W. 682.

Also, the burden is on the employer to prove knowledge of servant of danger or risk. Hollinshead v. Minneapolis, St. P. & S. Ste. M. R. Co. supra.; Kueckel v. O'Connor, 73 App. Div. 594, 76 N. Y. Supp. 829.

In such cases, i. e., negligence and contributory negligence, if it can

360 NORTH DAKOTA REPORTS

be said that different minds may honestly differ as to the inference and conclusion to be drawn from the testimony, it is properly a case for the jury. Hollinshead v. Minneapolis, St. P. & S. Ste. M. R. Co. supra; Haugo v. Great Northern R. Co. 27 N. D. 268, 145 N. W. 1053; Webb v. Dinnie Bros. 22 N. D. 377, 134 N. W. 41.

The release or settlement was obtained by the fraudulent representation that it was a written statement of the manner in which the injury to plaintiff occurred. The small money consideration was a mere gratuity and an added inducement for the perpetration of the fraud. Bessey v. Minneapolis, St. P. & S. Ste. M. R. Co. 154 Wis. 334, 141 N. W. 244.

The instructions of the court were a clear and concise statement to the jury of the law applicable to the case, and more especially to that feature which deals with the release and settlement. The court told the jury that plaintiff's proof must show fraud by clear and convincing evidence before they could find for plaintiff. Such words, used in the court's charge, have been construed to mean, "beyond a reasonable doubt." Leonard v. Territory, 2 Wash. Terr. 381, 7 Pac. 872.

At least, they mean more than a mere preponderance of proof. Hall v. Wolff, 61 Iowa, 559, 16 N. W. 710; Winston v. Burnell, 44 Kan. 367, 21 Am. St. Rep. 291, 24 Pac. 477.

The charge of the court placed all of that burden upon the plaintiff which the law would permit; it told the jury what the jury must find to have been proved by plaintiff, and also of the manner and how strong such proof should be. The charge of the court must be read and considered as a whole. Buchanan v. Minneapolis Threshing Mach. Co. 17 N. D. 343, 116 N. W. 335; McBride v. Wallace, 17 N. D. 495, 117 N. W. 857.

It was not necessary for plaintiff to return the money upon repudiation and before bringing suit. This is a case of fraud in the factum. The plaintiff did not know he was signing a release. It is also a case of fraud in the treaty itself, because plaintiff believed he was merely signing a statement of facts as to his injury. Malkmus v. St. Louis Portland Cement Co. 150 Mo. App. 446, 131 S. W. 148; Herman v. P. H. Fitzgibbons Boiler Co. 136 App. Div. 289, 120 N. Y. Supp. 1074; Bearden v. St. Louis, I. M. & S. R. Co. 103 Ark. 341, 146 S. W. 861;

St. Louis, I. M. & S. R. Co. v. Hambright, 87 Ark. 614, 113 S. W. 803; Illinois C. R. Co. v. Edmonds, 33 Ky. L. Rep. 933, 111 S. W. 331; Illinois C. R. Co. v. Vaughn, 33 Ky. L. Rep. 906, 111 S. W. 707; St. Louis & S. F. R. Co. v. Ault, 101 Miss. 341, 58 So. 102; Roberts v. Colorado Springs & I. R. Co. 45 Colo. 194, 101 Pac. 59; Simeoli v. Derby Rubber Co. 81 Conn. 423, 71 Atl. 546; Mullen v. Old Colony R. Co. 127 Mass. 86, 34 Am. Rep. 349; Parsons v. Lee, 24 N. D. 639, 140 N. W. 712.

FISK, J.  On February 23, 1912, plaintiff met with a serious personal injury while in defendant's employ, and he seeks by this action to recover damages therefor, basing his claim thereto upon the alleged negligence of the defendant in failing to provide him with a reasonably safe place to work.  The answer puts in issue the alleged acts of negligence set forth in the complaint, and alleges that the plaintiff's injury was the direct and proximate result of plaintiff's own negligence. Also that plaintiff knowingly assumed the risks incident to such employment.  As a further defense it is alleged that a full settlement was had between the parties of the alleged claim for damages, and that the plaintiff, for value, executed and delivered to defendant a release in full of all claims for damages occasioned by such injury. By way of reply plaintiff alleged in substance that on the date such purported release was executed he was lying in a hospital in Minot, suffering excruciating pain as the result of his injuries and was unfit to transact any business, and, on account of such pain he was at times unconscious and did not realize what was going on around him.  That on such day two men came into his room at the hospital and represented that they desired to obtain from him a statement as to the manner of receiving his injuries, and after asking plaintiff certain questions they requested him to sign a statement which he signed, believing the same to be a statement merely relating to his injuries, but which document he believes was the release aforesaid, and that he was thereby falsely and fraudulently deceived and misled by defendant's agents.  He further alleges that he did not, on the 29th day of February, 1912, nor at any time, agree with the defendant to release and discharge it from any or all liability which had or might thereafter accrue by

reason of such injuries, and that he never at any time agreed with defendant to settle said matter for $100 or for any sum whatsoever.

These issues were tried to a jury, resulting in a verdict and judgment in plaintiff's favor.  A motion for judgment *non obstante* or for a new trial was made and denied and judgment entered, to reverse which judgment and order this appeal is prosecuted.

Appellant's specifications challenge, in several particulars, the sufficiency of the evidence to justify the verdict, and they also call in question the correctness of numerous rulings and instructions, as well as refusals to instruct.  As we view the record it will be necessary to notice only the specification challenging the sufficiency of the evidence to show that the release aforesaid was obtained through fraud or misrepresentation on defendant's part, or that plaintiff was not, at the time of executing such release, capable of understanding the legal effect thereof.

Such release was executed on February 29, 1912, being six days after the plaintiff's injuries and about six months prior to the bringing of this suit, and is in the following words:

Whereas, the undersigned was injured on or about the 23d day of February, 1912, under circumstances claimed to render Bailey-Marsch Company, a corporation, liable in damages; and whereas the said Bailey-Marsch Company denies liability therefor, and whereas both parties desire to compromise and have agreed to adjust and settle the matter for the sum of One Hundred Dollars ($100), and the further payment of the bill at St. Joseph's Hospital and the bill of Dr. Pence for services.

Now, therefore, in consideration of said sum, the receipt of which is hereby acknowledged, and the further payment of said hospital and doctor bills, I, John W. Pope, do for myself, my heirs, executors, and administrators, hereby compromise said claim and release and forever discharge said Bailey-Marsch Company, a corporation, its successors and assigns, from any and all liability which has accrued or may hereafter accrue to myself, my heirs, executors, and administrators by reason of said injuries or damages occurring therefrom.  And it is fully understood and agreed that there is no agreement on the part of

the said Bailey- Marsch Company to do or omit to do any act or thing not herein mentioned.

Witness my hand and seal at Minot, North Dakota, this 29th day of February, 1912.

John W. Pope. (Seal)

Witness:

    A. R. Earl,

        Charles A. Edblom.

State of North Dakota,   } ss:
    County of Ward,      }

On this 29th day of February, in the year 1912, before me personally came John W. Pope, to me known, and known by me to be the individual described in, and who executed the foregoing instrument, and he acknowledged that he executed the same.

Charles A. Edblom,<br>Notary Public, Ward County, North Dakota.

The facts surrounding the settlement which culminated in the giving of such release are detailed by the various witnesses and in substance are as follows:

Plaintiff admits the payment to him of $100 on February 29th, and the undisputed evidence shows that defendant in the following June or July paid plaintiff's hospital bill, amounting to $261, and his doctor's bill, amounting to $325. The witness, Edblom, the notary public who took plaintiff's acknowledgment on such release, testified to his calling upon the plaintiff at the hospital in company with one Thompson, and testified to the fact that plaintiff signed and acknowledged such instrument in his presence, and that he, the witness, asked plaintiff if he had read and understood the contents of the document and if it was made and executed of his free will, to which plaintiff nodded, yes, whereupon the witness affixed his signature and seal to the certificate of acknowledgment. This witness also testified that when he called at the hospital to take such acknowledgment he observed plaintiff's apparent physical condition and heard him talk, and in the conversation between them the plaintiff responded promptly to questions asked him, and "from what I saw of the man in that transaction

he seemed to be able to understand what was going on around him, and, in my judgment, he was in full possession of his mental faculty.".

Plaintiff in rebuttal testified:

I heard Mr. Edblom's testimony; I do not remember that I signed any papers.

Q. Did they ask you to sign a written statement?

A. He did. I do not remember who was present there; I was, at that time, in lots of misery and pain and agony; as near as I can remember they came up to me and says "We have a statement here we want to make to you," and started to tell me about this statement; they asked me to sign a statement; I do not remember that I read any papers, I do not know the contents of any papers I signed; they told me it was a deposition of my accident here; they did not tell me it was a release; as near as I can remember it was a statement of what happened in the basement, acts surrounding the accident; that is what I thought I was signing; he said "We are going to pay your doctor's bill here, and then we will give you time for two months, of $96," and he says "We will put it up to $100 and that will keep you up until such time as you can get around, and the doctor says you will be out inside of two months, and that will hold you up until you get out of the hospital." I received $100 from them; it was for things I had demanded or something similar to that.

Q. For the time you had lost?

A. For the time I had lost.

Q. Or would lose?

A. Or would lose from that time up to the time I could go to work. I did not intend to sign any instrument and would not have signed any instrument at that time for a settlement if I had known what the instrument was; I first learned that I had signed Exhibit "D" when you (Sinkler) got a letter from the company; you sent for me to come to your office, and there you handed me that paper; that is the first I learned or knew that they claimed I had settled this matter.

On cross-examination he testified:

I do not remember seeing Thompson and Earl in the hospital at about the time this statement was talked about. I do not remember the occasion when they called. I do not remember seeing them; I remem-

ber these two men, but I do not remember who they were; I remember two men being beside the bed; I didn't remember at the time who they were. I knew Earl when I was down there at work; I did not recognize him for sometime afterwards; I do not remember him being there when this statement was made; I do not remember that they told me what was in it; I do remember they told it was a deposition of what occurred at the time of the accident; it was a statement I was to make to them of my recollection of what happened at the time of the accident; that is what I thought they wanted. I do not remember how long I had been in the hospital when these two men came to see me, it seemed a short time. I do not remember that I recognized the doctor at first, after I went to the hospital; sometimes I recognized people and other times I didn't. I began to recognize the doctor about the latter part of the first week. When these two men called I was in the first ward down stairs; I was in there maybe a little over two weeks; I left there some two weeks or more before the skin-grafting operation was performed; I had fully regained consciousness at that time; during all those early weeks I was not unconscious all the time; there were times when I didn't realize what I was doing.

Q. How do you know you didn't realize them?

A. I could tell it; my mind.

Q. You are testifying now about a statement that was obtained from you when you say you didn't have any mind, or realization, is that it? is that not so?

A. At that time.

Q. Is that one of the particularly bright spots in your memory, during those weeks, when they called for a statement?

A. I don't know whether you call it bright or not.

Q. You remember it?

A. I remember it. . . . I do not remember anything else in particular that occurred there during those two weeks.

Q. Do you recall getting $100 about that time?

A. Oh, that statement, yes. I gave the $100 to the girl shortly after they went away, some two or three minutes; I told her to put it away for me; I had her bring it back to me several times while I was in the hospital. I remember Miss Mulzof, the head nurse in my ward. I do not remember her being in the room when the statement was asked

for, nor when these men stated to her that the company would pay the hospital and doctor's bills, and that there had been a settlement made and that was part of it; I do not remember it. I do not remember a conversation with Sister Lucy of the hospital some weeks afterwards when I complained of my not recovering as fast as I ought; I did not tell her that I had settled with the company; I do not remember saying anything about it to her; if it occurred six weeks after I went to the hospital I would be in sound mental condition then.

Q. If she should testify that you did so say, would you say it was false?

A. I do not say it is false, but I do not remember it; if I did say it, it was true.

Q. You do not remember Mr. Edblom having asked you if you had read it and knew the contents of the instrument you signed at that time, when these two men were there?

A. No, sir.

Q. You do not remember seeing Edblom there?

A. At what time?

Q. Any time at all?

A. I believe I remember seeing him there once after that.

Q. After what?

.A. Along in the middle—or something like four or five weeks, maybe something like that.

Q. Was he there to see you?

A. I think so; some man was there; suppose it is the same man.

Q. That was four or five weeks after this occurrence of the statement?

A. Yes, sir.

Q. And this man Edblom came to see you?

A. Well, I do not know whether that was his name or not.

Q. Well, the man that was on the witness stand here, testifying to your acknowledgment to this agreement, is he the man you are talking about?

A. No, sir.

Q. Then you say you do not remember ever having seen Edblom at all?

A. I do not know, never heard of his name at all before until he was

up here—I remember signing a paper; if I read it I do not remember of it; I won't say I didn't read it; I do not remember reading it; if I read it I would not know what was in it.

Q. Why not?

A. I do not remember reading it.

Q. I ask you if you read it, wouldn't you remember reading it?

A. I think so, if I read it over—If I read it I do not remember what was in it now; I can't tell how I account for that; I suppose it was being in the condition I was; I had pain, I didn't care for anything at that time, I didn't care whether I lived or died; it didn't make any difference to me; I can remember I was in agony from start to finish. I didn't pay any attention to anything that was going on at all. At times I knew when they took the bandages off my leg; after the first day I remember when they took them off and put them on. I recognized the doctor and the nurses, and the inmates of the ward, and used to talk with them quite frequently. I do remember distinctly the details of this money payment, what it was for.

Q. How do you account for being so clear and distinct in your memory in regard to the details of that transaction?

A. Well, he just told me what it was for and I signed it.

Q. But you say that the thing you signed didn't have anything to do with money?

A. I never remember any money being in it.

Q. But what did you talk about signing it for if there wasn't anything about that there?

A. It was on a statement, the statement of how I got hurt, that is what I remember.

Q. Was there any money in the statement?

A. I do not know. The statement gave me money.

Q. I am asking you how you can remember so distinctly all that was said about the payment of money and what it was paid for, if you were in the condition you have described; how do you account for it now? You said they told you they would pay you $96 per month, was it?

A. That was it.

Q. For what, for wages?

A. $96 for wages.

Q. For how long?

A. For two months.

Q. And what other money were they to pay you?

A. $4 to make it $100. The paper I signed was the statement I have testified about, concerning the injury. I do not remember giving them any statement; I do not remember that they asked me questions; they may have, but I do not remember telling them anything about it. They asked me questions and I suppose I answered them; what questions they asked I do not remember; I have no recollection of what they asked me or what I told them; it was on the same day that they gave me the money; I do remember distinctly that they gave me $96 for two months' time and put in $4 to make it $100; that is clear and distinct in my mind; it all happened on the same day, and during the same visit of these two men. I remember sending for the girl to put the money away, but I do not remember whether it was the clerk in the hospital or not. The reason that I am not able to remember these things is because of the intense suffering and agony I was undergoing from my injuries; I was not able to understand much that was going on about me by reason of that fact. These men that were there requested me to sign the statement before I got the $100. I think they wanted me to sign before they gave me the money; I do not remember whether I signed it first or last.

Q. Why do you remember whether they requested you to sign it before you got the money?

A. Well, I said I did, but I don't. Referring to the occasion when these men were at the hospital, I remember the statement being handed me to sign, I remember the fact of signing it; I was lying on my back, but I don't remember how I signed it. I do not know who it was that gave me the money; I do not believe the doctor was there; I knew him before, but I didn't know those other men.

Q. Didn't you know whether they were men you had seen before or not?

A. Yes, sir.

Q. You knew you had seen them before didn't you?

A. I do not remember.

Q. But you remember you made the bargain you testified to here, about the $100, do you?

A. Yes, sir.

Q. That you can remember distinctly, that is right?

A. Yes, sir,—I am more positive about the $100 proposition than I am about the statement.

We have quoted the plaintiff's testimony in full bearing upon the alleged incapacity to execute the release and the alleged fraud and deceit practised upon him by the defendant, for it is all the evidence on this subject produced by him at the trial.

To rebut plaintiff's testimony the defendant offered as witnesses Dr. Pence, the physician in charge of plaintiff at the hospital, R. M. Thompson, who represented defendant in effecting the settlement, C. A. Edblom, the notary whose testimony we have heretofore referred to, A. L. Campbell, a patient in the same ward of the hospital where plaintiff was when the release was given, Julia Noakes, clerk in the hospital, Rosa Mulzof, nurse in charge of plaintiff's ward at the hospital, and Sister Lucy, one of the Sisters in charge of such hospital.

Dr. Pence testified:

I heard the testimony of the plaintiff when he was last on the stand. After he was taken to the hospital I was in attendance on the plaintiff for a period extending, with the exception of ten days, from February 23d to about the 10th of June; from March 9th to 20th I left him in charge of Dr. Ringo, a resident physician of Minot. During the first week of plaintiff's confinement in the hospital I called on him three times a day for the first three or four days and twice a day thereafter; during that period I examined his condition and record very closely; noted his temperature and pulse among other things; I changed the bandages once a day myself, and conversed with him every time I called; during that ten-day period I conversed with him about other things than his case. From my observation of his condition, his record in the hospital, my conversation with him about his case and other matters he was, after the first day or two, in my opinion, possessed of his full mental faculties at all times that I saw him. When I first saw him at the hospital on February 23d, he was unconscious; that condition did not last to exceed one hour after he arrived at the hospital; I saw him three times a day for three or four days, and twice a day thereafter; during that period his condition as to consciousness was practically normal; I found him in no unconscious condition during that period

29 N. D.—24.

other than when he was asleep; there was no indication of delirium during any of those visits; on those visits during the first week or ten days, I would spend on an average from thirty minutes to an hour with him at each visit.

Q. Do you wish to be understood that during all those five or six days that this man was not under the influence of morphine, he was suffering intense pain as you observed him, all the time?

A. He was not. There were seasons when he was not making manifestations of pain; at such time he conversed intelligently. In the proper treatment of this case while the patient was at the hospital there was no occasion for administering morphine in such quantities as to produce deadening of the mind, or delirium. I was with Mr. Thompson and Mr. Earl on one occasion when they went to the hospital; I think they went with me several days after the injury; I was in the room with them when Pope was and remember that he conversed with them, and also with me; I was there to note his condition; there was nothing in his condition at that time to indicate any abnormal condition of his mind; I was there on the following day and noticed no such abnormal condition, nor did I at any time after that.

The witness R. M. Thompson, who represented defendant in effecting the settlement, thus detailed the conversation which he had with plaintiff at and prior to obtaining the release:

I asked Pope about the matters leading up to the accident and he told me on the morning of that day he called to see Cockrum in regard to work, he said he had not been working for several days, and he stopped to see Cockrum and asked him if there was any work there, and Cockrum was talking with one of the other men, and he asked him if he could take care of the salamanders, and he told him he could do it if anyone could, and Cockrum told him about the work and said Dawson would show him how to do it, and told him not to go down in the hole, let all the smoke out, be careful not to stay down too long; he said Dawson then went down in the basement with him, showed him the location of the salamanders, told him to fill them, told him where to get the coal, told him not to stay down too long, but come up after filling each salamander. He stated he had filled all but the last salamander and was filling that, and the next thing he knew he was in intense pain

in the hospital. He stated he didn't know how the accident happened; didn't know anyone was to blame for it; thought it was entirely accidental. We then had some talk as to the probable time he would be laid up, and when I was there the day before the doctor had talked with him about the extent of his injuries, and he told him he expected to have him up and around in from eight to ten weeks, but he couldn't tell how long it would be before he would be able to get to work; that he was unable to state. I then asked Pope as to who was going to pay the expenses, but he said he didn't know, he said he wasn't able to, and I then took up the question as to whether he expected Bailey-Marsh Company to pay it. Well, he said, it was an accident, and I asked him what he expected them to do for him; he said he didn't know, that was up to them. I then asked him if he was willing to make a settlement if we paid him $100 and the hospital bill, and we had some discussion as to how long he would be in the hospital, what the doctor's bill would be, and we had some little talk as to what his services were, and he told me he was receiving $2 a day, and that $100 wouldn't pay his time for two months. We took the matter up with Earl and with Pope, and it was shown that the men hadn't been working regularly, and that even where the work was regular they had not averaged five days a week; he said $10 a week would pay him for about ten weeks; I said, I am not paying you for the time; I am willing to give you $100 for the lump sum; and I will take my chances on the extent of the hospital bill and the doctor's bill. We then had some further talk about the time, and as to what he had been doing; then he asked me as to whether or not he could go back to work when he was well, and I told him that I could not make any promise as to that; that Bailey-Marsh Company employed men, and that because he had been hurt there would be no prejudice against him for that, but I could not make an agreement to employ him, and under such circumstances men sometimes seem to think they might have jobs without work; I told him that I would make a settlement, pay him $100 in cash, and he would have to take his chances, and the company take their chances on the doctor's bill and the hospital bill. We then talked about several other matters; I asked him—we talked about where he come from, about his people, asked him how he was getting along, and we then went back and talked over the matter further; and it was finally agreed he would make a settle-

ment on the basis of $100 in cash, and the further payment of the bill of the hospital, St. Joseph's Hospital, and the bill of the doctor, Dr. Pence. I was at the hospital about an hour, I think. I then went down town to the bank and got $100; got Cockrum; I then went to the office of the Consumer's Power Company, where Mr. A. E. Stevens was then the manager; he was an acquaintance I had formed; known in Minneapolis; a man I had not seen for some six or seven years, and ran across him in the Leland, and he had taken me to the office and showed me the plant, and told me about the work he had been doing; I went to the office for the purpose of getting a typewriter for the purpose of drawing my release; I drew the release and asked Mr. Stevens if he knew of a notary public I could get to go to the hospital, and he introduced me to Mr. Edblom; he said he had to go there for the purpose of collecting from a meter, making a reading from a meter. We went to the hospital together. He went into the office, and I went back into the ward where Pope was, and I had made a copy of this release; it was typewritten and I gave him a copy, and I took a copy myself, and I read the release to him; I cannot say he read it; he appeared to, because he interrupted me a couple of times to ask about certain points; then after it was all brought up, he said, now, about this $100, do I get anything more? I told him no, that was—I would pay him $100 in cash, and there was no further promise except to pay the bill at the hospital and Dr. Pence, and he wanted to know how he was to know we would pay that bill, and I said I could call in a nurse and tell her, and he said all right. I then went out and got Mr. Edblom, who was working at the telephone; I think he was working at the telephone; fixing up something; and he came in with me, and Pope signed the release and Earl signed it as a witness, and Mr. Edblom then acknowledged it as a witness; I then asked Mr. Edblom, as he started to take the acknowledgment, to ask Pope if he understood what he was signing, and if it was of his own free will, and Mr. Edblom did that; Pope said yes, sir, it was a release, and it was his free act, and then Edblom signed as a notary and put his seal on, and his stamp as to when his commission expired. I then sent for the head nurse, Miss Mulzof, and she came in and I told her that I had made a settlement with Mr. Pope, and had gotten his release.

Q. Was that in the ward?

A. That was in the ward in the presence of Pope and Earl, and there were two, or possibly three, other patients in the ward at the time, and I told her that we had made this settlement, and gotten this release, gotten his release, and that the Bailey-Marsch Company was to pay the hospital bill for as long a time as it was deemed necessary for him to stay, and we were to pay Dr. Pence, and he said, yes, that is right, and she talked with us a few moments and went out. I then turned over $100 in bills to Mr. Pope; as I turned that over, right as soon as he signed it, and I went up—Mr. Earl took some oranges up and Pope pealed one and ate it and talked with us—and when I got back I noticed the peeling of another orange, whether he ate it or not I do not know.

Q. At the various times you were at the hospital and talked with Pope did you observe any manifestations of his suffering from pains at times, or all of the time?

A. At times I noticed it; the first afternoon I was there when Dr. Pence dressed his leg, and he took his finger and touched different places, and asked him, does that hurt, and certain times he would wince, and almost scream, and other times say, no, I don't feel that, that don't hurt; and when they took the bandages off he winced a little, and the following morning when I called to see him I asked him how he rested, he said he had a pretty fair night, was feeling better excepting when he moved. He seemed to be normal; he didn't seem to be under any great stress; if he was he didn't say so.

Q. How was he located physically in the bed where he was, was he lying down flat?

A. He was propped up with a couple of pillows.

Q. And where did he sign the paper?

A. There was a little table at the head of the bed he was on, that had the bag of oranges, the bag of oranges lay there, and that was moved over next to the bed, and he kind of reached over this way (indicating) and signed it.

The testimony of the witness Earl is quite lengthy and we shall not attempt to quote the same. Suffice it to say that in the main it corroborates the testimony of the last witness, but as to some details his testimony differs from that of the witness Thompson.

: The witness Campbell testified by deposition in substance as follows: "I am fifty years old; have lived in Minot twenty-five years. I have been confined to my bed in the hospital for a little over a year. I remember Mr. Pope, who was burned at the new Soo depot in February, 1912; he was in the same ward with me. I remember a man named Thompson came here to see him; he was a claim agent of the Soo, I believe, he represented either the Soo or the contractor. I heard the talk between Thompson and Pope about a settlement; they was figuring on the grounds of what he would have been able to earn if he had been up; Pope said he did not want to be unreasonable and said he would accept $100. I saw them counting out the money, but I don't know how much it was. This man Thompson also agreed to pay the hospital and the doctor's bills. I remember seeing Pope sign the papers; Thompson read them over to him. Pope did not seem to be suffering anything out of the ordinary; he talked just the same as he had been talking—seemed to be all right; I thought he seemed to understand what he was talking about. I heard him and some of the patients talking about the settlement afterwards; someone told him he should not have settled; Pope thought he had done all right, and said he had done as well as he could expect to do at the time; at that time he acknowledged that he had settled; this was after the papers were signed, after they had left; they used to be talking about it in the room. I understood it was a settlement for the damages he had sustained, in the fire; it was not for time lost; but they figured it up in that way, what time he had lost and the doctor's bill and the hospital bill; it was not a settlement for time lost merely; they agreed to pay doctor's and hospital bills and treatment, aside from actual damages he sustained in the injury. I know that Pope was not settling merely for time lost from the fact that Thompson told him in plain English that he would pay the doctor's bill and hospital bill and all bills, and asked him if he would be satisfied with $100. My bed was about 5 or 6 feet from Pope's. The paper that was read to Pope, from the sound of it, was a settlement with him for damages; Pope had it in his hands; I don't know that he read it, any more than that he was looking at it when Thompson read it to him. In talking about it afterward Pope said he thought it was a fair settlement, that he thought Mr. Thompson had

treated him very fairly, and that he was entirely satisfied with the settlement."

The witness Julia Noakes, a bookkeeper and office girl in the hospital during the time plaintiff was there, testified in substance: "I was bookkeeper and office girl in St. Joseph's Hospital while Mr. Pope was there in February, 1912. I remember Mr. Thompson coming there to see him; I did not hear any of the conversation; after Mr. Thompson had gone Mr. Pope sent for me, and I went to the ward where he was and he asked me to take some money and keep it for him in the office safe; I think there was $100 and a small check; I received the money; Mr. Pope would send for the money afterwards, quite often to draw from it."

The witness Rosa Mulzof testified: "In February and March, 1912, I was employed as head nurse on the first floor in St. Joseph's Hospital in Minot. I recollect Mr. Pope being brought here during the month of February. I remember two gentlemen calling to see him; I did not hear the conversation any more than that I was called in to witness to the fact that Mr. Pope was satisfied with the settlement of $100, and that the firm would pay the hospital and doctor's bills; I heard that statement made to Mr. Pope, and he said that he was satisfied with it. The last narcotic that was given to Mr. Pope prior to February 29th was on February 26th. After the time when I heard the settlement talked of between Mr. Thompson and Mr. Pope, I heard Mr. Pope talk about it a number of times, but I do not recall on what date it was; he commented on the fact that he had settled."

The witness, Sister Lucy, also testified in substance as follows: "I am known as Sister Lucy of St. Joseph's Hospital. I am one of the Sisters in charge of the hospital and was so when Mr. Pope was here in February and March, 1912. I recall an instance when some gentlemen called at the hospital and it was understood that a settlement had been made by Mr. Pope; I do not know the date. Some time in March, after the skin-grafting operation had been done, I was in the ward one day and he said his limb wasn't getting along quite as well as he would like for it to, or as he thought it would, but that he had settled with the company, so there is nothing more to be done."

Thereupon the plaintiff was recalled in rebuttal and testified as follows:

Q. You heard the statement in the depositions, you had talked with various persons about settlement?
A. I did.
Q. Did you have a talk with Sister Lucy in regard to settlement?
A. I did.
Q. And have you talked with other persons about settlement?
A. I did.
Q. With respect to these depositions, Sister Lucy's particularly, what did you mean when you talked about settlement?
A. I never did mean anything in particular only I never said anything to her, I do not think, about any deposition, or any release. I just spoke of having settled, and if I said that, why that was all.
Q. What did you mean when you said settlement, settled for what? What were you talking about?
A. She asked me then if I had settled with the company, and I said no, I haven't, in one way I have settled with them, on the release, and they said they would see me through, and help me through, and all this, and then on the other hand, and furthermore, I never did see any of them that claimed it is not a deposition.

In connection with the foregoing testimony we here call attention to a letter written and mailed by plaintiff to Bailey & Marsh on September 9, 1912, as follows:

Surrey, Nor. Dak. Spt. 9, 1912.
Kind Sir:—
This I have been intending to write for several days. I am the man that got burnt in the new depot at Minot, so I come out here in the country where I could get better treatment. They are not as good to a person in the hospital as they might be, so I thought I might as well get out of it. I am getting along fine so far and hope to be on my feet soon. I have spent what little change I had and I am in debt quite a bit, you know a person can't eat without mon. so now if you can help a cripple out, I would like to get it. You know I have been as easy on

you fellows as a man could be, now I will ask you to help me a little for I kneed it very badly.

And oblige,

John William Pope

Address
　　Surrey, N. Dak.

We have, perhaps, quoted from the testimony to a needless extent, but we do so because of the importance of the case and the fact that our decision is placed upon the sole ground that plaintiff settled and released his cause of action.

After considering the entire testimony bearing upon such settlement and release, we have no hesitancy in deciding, as we do, that the evidence is wholly insufficient to authorize a finding, either of fraud or misrepresentation upon the part of defendant's agent, Thompson, in procuring such release, or that plaintiff was mentally incapable of transacting business at the time such settlement was effected. The testimony to the contrary is overwhelming, and we are forced to the conclusion that plaintiff, who concededly had the burden of proof of showing facts relieving him of the legal effect of such formal release by clear and convincing proof, has failed in meeting such burden. Plaintiff's evidence as to his mental incapacity to transact business at the time of the settlement is, in many respects, somewhat irreconcilable and by no means clear and convincing, especially when viewed in the light of the testimony of numerous disinterested witnesses to the contrary. Moreover, his testimony is highly unreasonable. He contends, in effect, that the settlement was merely for time lost, or which he would necessarily lose by reason of the injury. Is it reasonable or probable that defendant would make a settlement merely of a portion of the damages which plaintiff might claim against it, and leave plaintiff a cause of action for other damages which he might be able to establish? Both reason and experience furnish a negative answer. It is inconceivable that Mr. Pence, Sister Lucy, Julia Noales, and Rosa Mulzof, employees in the hospital, as well as Edblom, the notary who took plaintiff's acknowledgment to the release, and the witness Campbell, all of whom, so far as the record discloses, were fair and unbiased witnesses, would intentionally and corruptly perjure themselves in order to defeat plain-

tiff's recovery as against this foreign corporation. Furthermore, the letter written by plaintiff to the defendant long after he left the hospital furnishes quite cogent proof against him. If plaintiff was not aware at that time of the settlement which he had effected, the tone of the letter would have been more in the nature of a demand than a mere screeve or appeal for financial aid as it clearly discloses that it was.

It was clearly the duty of the trial court to have granted defendant's motion at the close of the case, and also its subsequent motion for judgment *non obstante veredicto.*

The authorities in support of our conclusion are very numerous. We cite merely the following: Bessey v. Minneapolis, St. P. & S. Ste. M. R. Co. 154 Wis. 334, 141 N. W. 244, and cases cited; Laird v. Union Traction Co. 208 Pa. 574, 57 Atl. 987; Schweikert v. John R. Davis Lumber Co. 147 Wis. 242, 133 N. W. 136; Chicago & N. W. R. Co. v. Wilcox, 54 C. C. A. 147, 116 Fed. 913, and cases cited; Oakes v. Chicago, B. & Q. R. Co. 157 Iowa, 15, 137 N. W. 1062, and cases cited.

This court in numerous instances has recognized and enforced the general rule that solemn written instruments cannot be impeached for fraud or other cause except upon proof that is clear, satisfactory, and convincing, and of such a character as to leave in the mind of chancellor no hesitation or substantial doubt. Jasper v. Hazen, 4 N. D. 1, 23 L.R.A. 58, 58 N. W. 454; McGuin v. Lee, 10 N. D. 160, 86 N. W. 714; Carter v. Carter, 14 N. D. 66, 103 N. W. 425; Anderson v. Anderson, 17 N. D. 275, 115 N. W. 836.

The judgment and order appealed from are reversed and the cause remanded to the District Court with instructions to dismiss the complaint.